Rel: December 16, 2022

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

———————————————

## CR-20-0228

———————————————

## James Largin

## v.

## State of Alabama

## Appeal from Tuscaloosa Circuit Court
## (CC-07-2129.60)

MINOR, Judge.

In this appeal from the denial of a Rule 32, Ala. R. Crim. P., petition, we consider whether James Largin had ineffective assistance of trial counsel in the proceedings that led to his capital-murder convictions and death sentences for killing his parents. Proving "the truism that, regardless of the mitigation strategy that capital defense lawyers choose, they are often 'damned if they do, and damned if they don't' when their

clients later assert claims of ineffective assistance of counsel during collateral review," Morton v. Secretary, Florida Department of Corrections, 684 F.3d 1157, 1161 (11th Cir. 2012), this appeal requires us to consider Largin's claim that his trial counsel were ineffective during the penalty phase for introducing evidence of Largin's personality disorder—evidence that the sentencing court found mitigating. Although this Court has often considered claims that trial counsel was ineffective for not introducing evidence of a defendant's personality disorder, we have never ruled that counsel was ineffective for introducing such evidence, and, under the circumstances of this case, we reject Largin's request that we do so. We also reject Largin's other ineffective-assistance-of-counsel claims, and we affirm the judgment of the Tuscaloosa Circuit Court denying Largin's Rule 32 petition.

FACTS AND PROCEDURAL HISTORY

On direct appeal, this Court summarized the relevant facts from Largin's trial:

"Peggy and Jimmy Largin were at home on the night of March 15, 2007, when they were shot multiple times with a .22 caliber rifle and their bodies were thrown down the stairs leading to the cellar in their home. Autopsy results showed that both victims died as the result of close-range gunshot wounds to the head.

"Sheri Largin Lake, Largin's sister and Jimmy and Peggy's daughter, testified that she went to her parents' house sometime after 9:00 p.m. on March 15, 2007, and her parents and her brother were there. Largin had a history of drug and alcohol abuse, and he had recently been told to leave a residential treatment center for failing to follow the rules. Jimmy had picked Largin up from the treatment center and had brought him to the Largin residence. Largin had been living with his parents for approximately one week. Sheri testified that her mother had not wanted Largin to stay in the house because he previously had stolen money and property from them.

"Sheri was unable to make telephone contact with her parents on March 16, 2007, which was unusual. She drove to their house that evening and found the house dark and the front door locked, which was also unusual. Sheri entered the house, called out to her parents, and walked to her mother's room, where she saw blood on the floor. She left the house and called emergency 911. The Largins had been in their bedrooms when they were shot with a .22 caliber rifle, and their bodies had been dragged through the house and thrown down the basement stairs. A mop with blood on the handle was found in the kitchen sink. Forensic analysis revealed that DNA on the mop handle was consistent with a mixture of Peggy's DNA and Largin's DNA. Officers observed swirl marks on the kitchen floor that indicated that someone had attempted to clean something up with a mop. Largin's fingerprints were found on several containers of cleaning products recovered near the kitchen sink. Sheri testified that her brother was not at the house when she arrived that night and that her deceased sister's Trans Am automobile, which was kept on the Largins' property, was missing. Several items had been stolen from the house, including credit cards belonging to Jimmy and Peggy, a rifle, and Peggy's floral makeup bag in which she kept her set of keys and a substantial amount of cash.

3

"Testimony further established that Largin drove the Trans Am to a friend's house between midnight and 1:00 a.m. on the night of the murders. Largin purchased crack cocaine several times during the next 24 hours and smoked it with some of his acquaintances. Those acquaintances testified that Largin drove the Trans Am on several outings during that time, that he was in possession of the floral pouch that was identified as belonging to Peggy, and that he seemed to have a large amount of money. When Largin ran out of cash to purchase drugs, he began using his parents' credit cards. Several purchases were verified by receipts and surveillance videos. Largin purchased some items from a Walmart discount store and traded them for more drugs.

"Law-enforcement officers were notified of the issuance of a 'BOLO'—be on the lookout—for the Trans Am. Officers located the car parked at an apartment complex. Soon after the car was located, Largin and a companion came out of one of the apartments and walked toward the car. They had intended to travel to another location to purchase more crack cocaine. Officers took Largin into custody.

"Investigator Simon Miller had been a friend of Jimmy's for several years, and both he and Jimmy were members of the Church of Jesus Christ of Latter Day Saints. He also knew Peggy and had been introduced to Largin and Sheri. Miller had chatted with Largin on more than one occasion before the murders. Miller spoke with Largin at the police department after he was arrested, and Largin told Miller, 'It wasn't murder ... not in a cold-blooded sense.' (C. 836.) Largin further stated that he started to clean up the crime scene but then decided not to, and that he did not 'try to hide it.' (C. 838.)

"Several inmates with whom Largin had been incarcerated testified that they heard Largin admit that he had killed his parents. Largin also said that his parents were where they were supposed to be and that, if it were necessary,

4

he would do it again."

Largin v. State, 233 So. 3d 374, 388-89 (Ala. Crim. App. 2015). The jury convicted Largin of two counts of capital murder for killing his parents. See § 13A-5-40(a)(2), Ala. Code 1975 (murder made capital because it was committed during a robbery), and § 13A-5-40(a)(10), Ala. Code 1975 (murder of multiple victims made capital because it was committed under one scheme or course of conduct).

At the penalty phase, the defense offered evidence about (1) Largin's work history, (2) his upbringing and family life, (3) his problems with substance abuse and depression, and (4) his alleged personality disorder. (Trial R. 2215-2434.)[1] The defense also cited his lack of a significant criminal history. (Trial R. 2499.)

Largin presented testimony from his uncle, Mike Largin; Jonathan Friday, a former boyfriend of Largin's sister, Sheri; Largin's great aunt, Christine Largin; and Largin's cousin, Teresa O'Rourke. Their testimony

---

[1]"Trial C." refers to the clerk's record in Largin's direct appeal; "Trial R." refers to the reporter's transcript in the direct appeal. See Rule 28(g), Ala. R. App. P. See also Hull v. State, 607 So. 2d 369, 371 n.1 (Ala. Crim. App. 1992) (noting that this Court may take judicial notice of its own records).

suggested that Largin's household during his childhood was filled with arguing, fighting, and verbal abuse. (Trial R. 2215-51 2271-94, 2351-52.)

Largin also presented testimony from Dr. Karen Salekin, a clinical psychologist and mitigation specialist. Salekin testified that she interviewed Largin 4 times and interviewed 19 individuals, including family members, former employers, and family friends. (Trial R. 2301.) Dr. Salekin was unable to speak with Largin's sister, Sheri, or with Largin's ex-wife, Dixie. (Trial R. 2305.) Other individuals refused to talk to her. (Trial R. 2306-07.)

Dr. Salekin also reviewed "a large volume of medical records pertaining to [Largin's] mental health history, his hospitalizations at North Harbor, Indian River[s] [Community] Mental Health Center, the Crisis Stabilization Unit, Bryce Hospital, and Serenity Care." (Trial R. 2308.) Dr. Salekin testified that, beginning in 2006, Largin was hospitalized several times for attempting suicide or having suicidal thoughts. (Trial R. 2309.) On cross-examination, she testified that some of Largin's suicide attempts or "gestures" could have been "manipulation, a way to attention, … a way to get into the hospital to get help." (Trial R. 2353.) She testified that Largin's ingestion of antifreeze and then telling

6

others about it was likely not an instance in which he "intended to kill himself." (Trial R. 2357.) But she testified about one suicide attempt:

> "It would indicate that he went to the degree … that he could have lost his life at that point in time. Could have. But as was mentioned before, he also did these things in front of people. And that—it's a game that is dangerous to play. When people go to that degree to try to kill themselves and weigh the likelihood of someone saving them and being taken to the hospital in the appropriate time, it's getting to the point where they are making a dangerous and bad decision. …
>
> "… [A]s I mentioned yesterday, I think they are manipulative gestures. But the judgment in making that—and I think the [suicide attempt], the one before with the antifreeze, really demonstrates his inability to make good decisions, his potentially impulsive behaviors."

(Trial R. 2410-11.)

Dr. Salekin testified that the records showed that Largin had "clinical diagnoses" of "[m]ajor depression," "impulse control disorder," and "polysubstance abuse disorder." (Trial R. 2312.) Dr. Salekin testified that Largin did not have an official diagnosis of a personality disorder, but she said that his records referenced traits she described as "Cluster B" traits—"behaviors that tend to get people in trouble interpersonally because they are either—they can be insulting people, they can be very clingy and needy people, they can be very arrogant people"—and "Cluster C" traits. (Trial R. 2312-13.) Dr. Salekin said that individuals with

7

"Cluster B personality disorders" generally have "wild" emotions, are unpredictable, and "can be … violent toward themselves" or others. (Trial R. 2313-14.) She testified that individuals with Cluster B characteristics are generally not treatable with medication, and care usually focuses on behavior management. (Trial R. 2313-14.)

Dr. Salekin testified that "there did not seem to be a whole lot of successful treatment for Mr. Largin." (Trial R. 2315.) Salekin testified that, in her opinion, Largin had a "significant" mental illness. (Trial R. 2318.) She testified that he had "a characterological problem" and that he suffered from "narcissistic personality disorder" ("NPD"). (Trial R. 2319.) She testified that a person with NPD "comes across as being very arrogant, grandiose in their thinking, [and] tend to have a pretty high sense of entitlement meaning they want other people to do things for them." (Trial R. 2319.) Dr. Salekin cited the Diagnostic and Statistical Manual of Mental Disorders as a basis for testimony. (Trial R. 2321.)

Dr. Salekin stated that someone does not simply get over a personality disorder and that Largin could not just "get over" it. But, she testified, "long-term individual psychotherapy" could be beneficial. (Trial R. 2332-33.) She described Largin has having "more than just a bad

8

personality. His particular group of characteristics are not pleasant. People usually don't want to be around folks with this personality. They find them off-putting, entitled, demanding, those kind of things." (Trial R. 2334-35.)

Dr. Salekin testified that, in her opinion, Largin had a "severe" mental disorder that had "impacted his ability to connect with people for probably for most of his life." (Trial R. 2337-38.) In her opinion, NPD caused him to have "trouble controlling his impulses." (Trial R. 2340.) Dr. Salekin testified about "impulsive behavior":

> "It's just a way of describing someone who doesn't put a lot of thought into what they do. They just—they do things without thinking. They don't weigh the consequences of their behaviors very well and come out the other end needing to deal with what has happened and may have the hindsight of, oh, that was a bad idea, but they don't have the foresight to actually prevent themselves in the same way that people with good judgment [have]. We all make mistakes. But in these cases they are more apt to make bad judgments with little insight prior to making their decisions."

(Trial R. 2411-12.) Dr. Salekin testified that, in her opinion, Largin did not "have the capacity to connect with people. … He's not really going to understand what it might feel to other people having lost a child or experiencing an illness or something like that. … [P]eople with this disorder don't have the real ability to feel for other people." (Trial R.

9

2412.)

Dr. Salekin testified that she was not "trying to make excuses for what [Largin] did." (Trial R. 2341.) She stated:

"I'm just trying to explain as best I can who Mr. Largin is and how he got to be the way he is. Mr. Largin is in a situation that's unusual and we're all trying, I think, to grasp what it could have been that got him into the situation. So that's all I'm trying to do and put it all together so that it makes some sense out of a very nonsensical and horrible situation."

(Trial R. 2341-42.)

When questioned about specific statutory mitigating circumstances, Dr. Salekin testified that "in comparison to" other cases she had worked on, Largin's three domestic-violence charges did not present "a significant history of prior criminal activity," but she also did "not want to minimize the fact that he has … three domestic violence charges." (Trial R. 2337.) On cross-examination, the State also asked Dr. Salekin about statements from Largin in which he said that, on his honeymoon, "he assaulted a man after seeing his wife kissing another man." (Trial R. 2376.)

The State also asked Dr. Salekin about details of Largin's medical records. She acknowledged that the records suggested that Largin had used cocaine and that he had attempted suicide by trying to overdose

10

using Xanax, cocaine, and alcohol, and by ingesting antifreeze. (Trial R. 2355.) Dr. Salekin testified that Largin's chart from North Harbor had "'manipulative' all over it." (Trial R. 2361.) The records stated that Largin acted hostile toward the staff and misrepresented what they told him. (Trial R. 2363.)

The records included statements that Largin gave a controlled substance (Klonopin) to another patient, that he had his wife sneak in cigarettes and marijuana, and that he had "cheeked medication …. keep[ing] [it] in [his] cheek, … pretend[ing] [he] swallowed it, and [using] it for some other purpose." (Trial R. 2361-62, 2366). The records included statements from Largin that he regretted "putting a cat in a freezer" and that he regretted "in 1990 beating a man unconscious and trying to throw him off a balcony." (Trial R. 2375.) The records stated that Largin did not take responsibility for his actions.

The State questioned Dr. Salekin about statements in the records that Largin had a good relationship with his parents and a good childhood. (Trial R. 2359, 2394). Dr. Salekin did not dispute that the records suggested that Largin's allegations of abuse or of a turbulent childhood came only after Largin had applied for disability benefits.

11

(Trial R. 2360.) Dr. Salekin also testified that, while at North Harbor, "[t]he implication from the records was [Largin] was going to try to use his current hospitalization and the record that he had developed … to then apply for disability status." (Trial R. 2358.) She testified, however, that it was not "unusual" for someone like Largin to at first refuse "to open up" about his childhood. (Trial R. 2408.)

Dr. Salekin testified that she did not think "that poor parenting caused Mr. Largin to do anything." (Trial R. 2390.) She testified that in her opinion Largin was manipulative. (Trial R. 2396.) Dr. Salekin stated that she based her "diagnosis of Mr. Largin … primarily … on records because of [her] concern" that he could be manipulative. (Trial R. 2396.) She explained that being manipulative was "part and parcel of what he has, the disorder." (Trial R. 2406.)

Dr. Salekin summed up her opinion of Largin:

> "So in terms of the uniqueness of Mr. Largin and his decisions, he in my opinion has this particular disorder to such a degree that his impairment is different. I can't tell you what part of his history impacted it and I can't tell you if there was something in his brain. I can tell you that in my opinion he became the person he did and did something very unusual, as maybe we can call it unique. He did something unusual that most people would not.
>
> "But again people with disorders—many people with

12

> disorders do things that we don't understand. And this—I don't think anybody can really come up to a good explanation as to why it happened."

(Trial R. 2430.)

At the end of the penalty phase, the jury recommended, by an 11-1 vote, a death sentence for each count, and the circuit court followed the jury's recommendation and sentenced Largin to death.

The circuit court found that two aggravating circumstances existed: that Largin committed the murders during the commission of a robbery, § 13A-5-49(4), Ala. Code 1975, and that he murdered both his parents by one act or under one scheme or course of conduct, § 13A-5-49(9), Ala. Code 1975. The circuit court found that one statutory mitigating circumstance existed: that Largin did not have a significant criminal history, § 13A-5-51(1), Ala. Code 1975. The circuit court found that several nonstatutory mitigating circumstances existed: that Largin suffered from NPD; that Largin's turbulent family history affected his upbringing; that Largin suffered from alcohol- and substance-abuse problems; that Largin's education, military service, and work history were evidence of his good character; and that Largin exhibited good behavior while he was incarcerated. The circuit court found that no other nonstatutory

mitigating circumstances, "including remorse," existed. (Supp. Trial C. 35-38.)

This Court affirmed Largin's convictions and sentences. Largin v. State, 233 So. 3d 374 (Ala. Crim. App. 2015). The Alabama Supreme Court denied certiorari review on April 21, 2017, Ex parte Largin (No. 1151272), and on that same date this Court issued a certificate of judgment, making Largin's convictions and sentences final. The United States Supreme Court denied certiorari on November 27, 2017. Largin v. Alabama (No. 17-5678).

In April 2018, Largin timely filed a postconviction petition under Rule 32, Ala. R. Crim. P., challenging his convictions and sentence.[2] (C. 61.) Largin alleged three categories of claims: (1) claims alleging that his counsel was ineffective; (2) claims alleging that the State withheld exculpatory and impeachment evidence; and (3) a claim alleging that he

---

[2]Largin paid the filing fee. (C. 60.) See Rule 32.6(a), Ala. R. Crim. P. ("A proceeding under this rule is commenced by filing a petition, verified by the petitioner or the petitioner's attorney, with the clerk of the court. ... [The petition] shall also be accompanied by the filing fee prescribed by law or rule in civil cases in the circuit court unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis.").

has a long-term mental illness that, he alleged, renders him "categorically" ineligible for the death penalty.[3]

After the State responded (C. 204), the Tuscaloosa Circuit Court scheduled an evidentiary hearing on two of Largin's claims: (1) Claim I.A.1., in which Largin alleged that his counsel were ineffective for not having "a unified theory of the guilt and penalty phases" of his defense, and (2) Claim I.A.5., in which Largin alleged that his counsel should not have called "Dr. Karen Salekin, a psychologist and mitigation expert," to testify during the penalty phase. (C. 69, 81, 278; R. 7-9.)

At the evidentiary hearing, Dr. Salekin testified that Largin's counsel retained her in the case as a mitigation expert. In that role, Dr. Salekin learned about Largin's family, personal, medical, psychiatric, and educational histories. (R. 11.) She reviewed records that counsel provided her, including records from Serenity House and DCH Regional

_____

[3]Largin does not challenge the circuit court's dismissal of his claims alleging that the State withheld evidence or his claim challenging the constitutionality of his death sentence. Thus, those claims are deemed abandoned and are not properly before this Court. See, e.g., Jones v. State, 104 So. 3d 296, 297 (Ala. Crim. App. 2012) ("Other claims raised in [the] petition were not pursued on appeal and, therefore, those claims are deemed abandoned. See, e.g., Brownlee v. State, 666 So. 2d 91, 93 (Ala. Crim. App. 1995) ('We will not review issues not listed and argued in brief.').").

Medical Center and notes from Dr. Omar Mohabbat, Largin's outpatient psychiatrist at Indian Rivers Community Mental Health Center. (Trial C. 204; R. 15.) Dr. Salekin noted that, after reviewing the records, she talked with trial counsel. She said that her "primary concern was personality characteristics, all of which for Mr. Largin were negative. Things like arrogant, manipulative, lacking empathy for others." (R. 16-17.) She "ultimately concluded [Largin] has narcissistic personality disorder, which is an elevated level of problems that lead to impairment in functioning …. in a manner typical or acceptable in our community, in our society." (R. 19-20.)

Dr. Salekin testified that she considered "evidence of a personality disorder or characterological disorder" as "generally aggravating." (R. 20.) She also testified that she would not advise a defense team to "proactively present evidence that their client suffers from a personality disorder." (R. 20-21.) She testified that ordinarily she would try "to contextualize a personality disorder within a defendant's life or his or her history" but that she was unable to do so in Largin's case because she had talked with "very few people that could provide any helpful background in terms of his upbringing and the things he experienced." (R. 22.) Dr.

16

Salekin testified that she "warned" trial counsel early in the case that she was encountering "roadblocks" in getting a "full picture" of Largin's childhood home environment. (R. 23-25.) She stated that her testimony in the penalty phase about Largin's narcissistic personality disorder damaged his case and that she thought that Largin's counsel was "wrong" for calling her to testify. (R. 27-28.)

Dr. Salekin identified other negative information in Largin's medical records that she had concerns about the jury learning such as Largin's putting a cat in a freezer, beating a man unconscious in 1990 and trying to throw him off a balcony, giving a controlled substance to another patient at North Harbor, and being released from Serenity Care for abusing medication. (R. 30-32.) The State questioned Dr. Salekin during the penalty phase about each of those instances, as well as other negative information in Largin's records.

Dr. Salekin testified that she warned trial counsel before trial that she thought her "testimony would do more harm than good." (R. 34-35.) On cross-examination, however, Dr. Salekin acknowledged that no concern about testifying appeared in her notes about two months before Largin's trial or in an email from her to trial counsel about a month before

17

trial. (R. 48-50.)

Dr. Salekin acknowledged at the Rule 32 hearing that, although narcissistic personality disorder is not curable, Largin could benefit from therapy. (R. 33, 47.) She also acknowledged that she spoke with "several individuals" about Peggy and Jimmy Largin. (R. 37-38.) She recalled speaking with Largin's cousin, Teresa O'Rourke, about her history inside the Largin home and "incidents of emotional, physical, and sexual abuse." (R. 38.) Dr. Salekin also acknowledged that defense counsel had presented testimony during the penalty phase about Largin's turbulent home environment during his childhood. (R. 38-45.)

On questioning from the Rule 32 court, Dr. Salekin acknowledged that the sentencing court found that Largin's NPD was a nonstatutory mitigating circumstance, but she stated that she disagreed with that finding. (R. 54.)

Leon Storie testified he and cocounsel James Smith represented Largin at trial and that Smith served as lead counsel.[4] (R. 58-59.) For strategic decisions, Storie and Smith would "consult with each other and kind of bounce each other's ideas back and forth, pros and cons.

---

[4]Smith died before the Rule 32 hearing. (R. 89.)

Ultimately the final decision was [Smith's] as lead counsel." (R. 59.)

Storie testified that Largin's case was his "first official appointment on a

capital case." (R. 68.) Storie testified that he thought Smith "had handled

about five capital cases in [that] circuit" before representing Largin. (R.

69.) Storie stated that the "nature of the case made it difficult" because

there was strong evidence of guilt including "a statement, a confession,

…. [and] video of some transactions that were made with [Largin's]

parents' money, credit cards, whatever." (R. 59.) He noted that, after the

circuit court denied the motion to suppress Largin's statement, counsel

"worked out a plea arrangement" for Largin to "plead guilty and …

receive a sentence of life without" the possibility of parole. (R. 60.) But

because Largin "was not comfortable with admitting to the facts," the

deal fell apart.[5] (R. 60-61.) Storie testified that, after Largin refused the

---

[5]On direct appeal, Largin argued that the trial court erred when it refused to accept his negotiated best-interest guilty plea. This Court noted:

> "The State set out the terms of the plea agreement it had offered, and one of the terms was that Largin actually plead guilty to capital murder. The State made it abundantly clear that it would not agree to a best-interest plea. Largin then repeatedly stated [to the trial court] that he was unwilling to concede his guilt or to plead guilty to the crime with which he had been charged."

plea deal, counsel thought that, for a trial strategy, their options were to "rely on basic reasonable doubt" or "offer an alternative scenario" that someone else committed the murders. (R. 61, 84.) He testified that "we ultimately went with offering an alternative scenario." (R. 61.) Storie noted that he "felt like once we lost on the motion to suppress, the penalty phase was going to become very important." (R. 61.) He also testified that counsel had "discussions about … [what] could be perceived as inconsistent" theories in the guilt phase and penalty phase. (R. 84.)

Storie testified that they retained Dr. Salekin and, for mitigation, planned to present a theory that "Largin's father was an abusive man and had abused all the kids in the house and, because of this, had basically created an environment where they were afraid of him, they disliked him, and that … [Largin] didn't really have much of a shot, given that environment." (R. 62.) Storie said that he and Smith "met with Dr. Salekin several times" and that he reviewed notes from Al Kofman, who "was the investigator" who "had taken notes of interviews he had done

Largin, 233 So. 3d at 392. This Court rejected Largin's argument: "Largin was unwilling to plead guilty under the terms offered by the State, and he cannot now argue that the trial court erred in refusing to accept his plea." Id.

20

with various folks who could offer possible mitigation." (R. 62-63.)

He testified that "[a]t some point [Dr. Salekin] became concerned about her testimony. She was afraid that her testimony had the potential to backfire." (R. 64.) Storie testified that Dr. Salekin "never said I won't testify" but that he thought "she expressed concerns about whether she should testify." (R. 65.) Storie testified that he "took [her concerns] seriously." (R. 67.) He stated that "[t]he fact that there [were] parents involved was always an important factor because we thought a reasonable juror would ask why would a person kill their parents." (R. 82.) He noted that Largin's case was not "your typical just killing somebody because of a drug deal or whatever." (R. 82.) Storie testified that Smith decided to present Dr. Salekin's testimony with "the knowledge that it could backfire" but thought "that there was a possibility that it could be helpful." (R. 86.) Storie testified that Smith "articulated that he felt that [Dr. Salekin] would offer something that would explain the behavior that the jury had already found had taken place." (R. 87.)

After the evidentiary hearing, the circuit court denied the petition. (C. 605.) The circuit court later denied Largin's motion for

21

reconsideration, and Largin timely appealed. (C. 630, 645-46.)

STANDARD OF REVIEW

"'[Largin] has the burden of pleading and proving his claims. As Rule 32.3, Ala. R. Crim. P., provides:

"'"The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

"'"The standard of review this Court uses in evaluating the rulings made by the trial court [in a postconviction proceeding] is whether the trial court abused its discretion." Hunt v. State, 940 So. 2d 1041, 1049 (Ala. Crim. App. 2005). However, "when the facts are undisputed and an appellate court is presented with pure questions of law, [our] review in a Rule 32 proceeding is de novo." Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001). "[W]e may affirm a circuit court's ruling on a postconviction petition if it is correct for any reason." Smith v. State, [122] So. 3d [224], [227] (Ala. Crim. App. 2011).

"'As stated above, [some] of the claims raised by [Largin] were summarily dismissed based on defects in the pleadings and the application of the procedural bars in Rule 32.2, Ala. R. Crim. P. When discussing the pleading requirements for postconviction petitions, we have stated:

"'"The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The

22

full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So. 2d 724 (Ala. Crim. App. 2003)."

"'Hyde v. State, 950 So. 2d 344, 356 (Ala. Crim. App. 2006).

"'"'Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So. 2d 364, 406 (Ala. Crim. App. 1999). In other words, it is not the pleading of a conclusion 'which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 So. 2d 1370, 1373 (Ala. Crim. App. 1993)[, overruled on other grounds by Robey v. State, 950 So. 2d 1235 (Ala. Crim. App. 2006)]. It is the allegation of facts in pleading which, if true, entitle a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged facts."

"'Boyd v. State, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003). "[T]he procedural bars of Rule 32[.2, Ala. R. Crim. P.,] apply with equal force to all cases, including those in which the death penalty has been imposed." Burgess v. State, 962 So. 2d 272, 277 (Ala. Crim. App. 2005).

"'Some of [Largin's] claims were also dismissed based on his failure to comply with Rule 32.7(d), Ala. R. Crim. P. In discussing the application of this rule we have stated:

"'"[A] circuit court may, in some

23

circumstances, summarily dismiss a postconviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R. Crim. P., provides:

"'"'If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.'

"'"'"Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition."' Bishop v. State, 608 So. 2d 345, 347-48 (Ala. 1992) (emphasis added) (quoting Bishop v. State, 592 So. 2d 664, 667 (Ala. Crim. App. 1991) (Bowen, J., dissenting)). See also Hodges v. State, 147 So. 3d 916, 934

(Ala. Crim. App. 2007) (a postconviction claim is 'due to be summarily dismissed [when] it is meritless on its face')[, rev'd on other grounds, Ex parte Hodges, 147 So. 3d 973 (Ala. 2011) ]."

"'Bryant v. State, 181 So. 3d 1087, 1102 (Ala. Crim. App. 2011).'

"Washington v. State, 95 So. 3d 26, 38–39 (Ala. Crim. App. 2012).

"[Largin's] remaining claims were denied by the circuit court after [Largin] was afforded the opportunity to prove those claims at an evidentiary hearing. See Rule 32.9(a), Ala. R. Crim. P.

"When the circuit court conducts an evidentiary hearing, '[t]he burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.' Davis v. State, 9 So. 3d 514, 519 (Ala. Crim. App. 2006), rev'd on other grounds, 9 So. 3d 537 (Ala. 2007). '[I]n a Rule 32, Ala. R. Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.' Wilson v. State, 644 So. 2d 1326, 1328 (Ala. Crim. App. 1994). Rule 32.3, Ala. R. Crim. P., specifically provides that '[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.' '[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo.' Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001). 'However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, "[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition."' Boyd v. State, 913 So. 2d 1113, 1122 (Ala. Crim.

25

App. 2003) (quoting <u>Elliott v. State</u>, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992)).

"Finally, '[a]lthough on direct appeal we reviewed [Largin's] capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate court is reviewing the denial of a postconviction petition attacking a death sentence.' <u>James v. State</u>, 61 So. 3d 357, 362 (Ala. Crim. App. 2010) (citing <u>Ex parte Dobyne</u>, 805 So. 2d 763 (Ala. 2001)). With these principles in mind, we review the claims raised by [Largin] on appeal."

<u>Marshall v. State</u>, 182 So. 3d 573, 580-82 (Ala. Crim. App. 2014).

## DISCUSSION

On appeal, Largin argues that the circuit court erred in denying or summarily dismissing several claims in which Largin alleged that his counsel was ineffective.

"'To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1) that counsel's performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

"'"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. […] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

26

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

"'<u>Strickland</u>, 466 U.S. at 689.

"'"[T]he purpose of ineffectiveness review is not to grade counsel's performance. <u>See</u> <u>Strickland</u> [v. Washington], [466 U.S. 668,] 104 S. Ct. [2052] at 2065 [(1984)]; <u>see also</u> <u>White v. Singletary</u>, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' <u>Strickland</u>, 104 S. Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial

lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)."

"'<u>Chandler v. United States</u>, 218 F.3d 1305, 1313–14 (11th Cir. 2000) (footnotes omitted).

"'An appellant is not entitled to "perfect representation." <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). "[I]n considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987).'

"<u>Yeomans v. State</u>, 195 So. 3d 1018, 1025-26 (Ala. Crim. App. 2013). Additionally, '"[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."' <u>Ray v. State</u>, 80 So. 3d 965, 977 n.2 (Ala. Crim. App. 2011) (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1316 (11th Cir. 2000)).

"We also recognize that when reviewing claims of ineffective assistance of counsel 'the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.' <u>Strickland v. Washington</u>, 466 U.S. 668, 698, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This Court, however, has held that when the same judge presides over both the original trial and the postconviction proceeding—as is the case here—and finds that, under the second prong of <u>Strickland</u>, trial counsel's errors would not have resulted in

28

prejudice, '[w]e afford the experienced judge's ruling "considerable weight."' Washington v. State, 95 So. 3d 26, 53 (Ala. Crim. App. 2012) (emphasis added) (affirming the circuit court's denial of Washington's postconviction ineffective-assistance-of-counsel claim by applying the 'considerable weight' standard). See also State v. Gamble, 63 So. 3d 707, 721 (Ala. Crim. App. 2010) (affirming the circuit court's granting of Gamble's postconviction ineffective-assistance-of-counsel claim by applying the 'considerable weight' standard) (citing Francis v. State, 529 So. 2d 670, 673 n.9 (Fla. 1988) ('Postconviction relief motions are not abstract exercises to be conducted in a vacuum, and this finding is entitled to considerable weight.'))."

Marshall, 182 So. 3d at 582-83. With these principles in mind, we address Largin's arguments on appeal.

## I. CLAIMS DENIED AFTER THE EVIDENTIARY HEARING

Largin argues first that the circuit court erred in denying claims I.A.1. and I.A.5. after the evidentiary hearing.

### A.

Largin argues that "[t]he circuit court erred in denying Largin's claim [I.A.5.] that [his trial counsel were ineffective] by calling Karen Salekin to testify over her express warning that her testimony would do more harm than good." (Largin's brief, p. 20.)

In denying this claim, the Rule 32 court found:

"In claim I.A.5 of his petition, Largin challenges trial counsel's decision to call mitigation expert Dr. Karen Salekin

29

to testify during the penalty phase. This Court recognizes that trial counsel's 'decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy and "a tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have chosen it."' Woodward [v. State], 276 So. 3d [713,] 764 [(Ala. Crim. App. 2018)]; see also Clark [v. State], 196 So. 3d [285,] 306 (Ala. Crim. App. 2015)] ('"'Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel.'"' [quoting Davis v. State, 44 So. 3d 1118, 1132 (Ala. Crim. App. 2009), quoting in turn People v. Eisemann, 248 A.D.2d 484, 484, 670 N.Y.2d 39, 40-41 (1998)]). Additionally, this Court must review such challenges objectively and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]' Benjamin v. State, 156 So. 3d 424, 430 (Ala. Crim. App. 2013) (citation omitted). In this instance, Largin has not overcome this presumption and shown that trial counsel's decision to call Dr. Salekin was unreasonable based on the circumstances at the time of trial.

"First to the extent that Largin's petition alleges that trial counsel deficiently investigated the mitigation evidence, this Court finds that counsel performed a reasonable investigation. During the evidentiary hearing, Dr. Salekin testified that she was retained early in Largin's case, that she reviewed multiple records and spoke with multiple individuals, and that she cautioned trial counsel that her testimony could potentially be harmful. [Leon] Storie testified that he and Smith not only met with Dr. Salekin regularly but also met with Investigator Al Kofman to discuss interviews Kofman had conducted. Storie also noted that Dr. Salekin expressed her concern to trial counsel that she 'was afraid that her testimony had potential to backfire.' He further testified that he had consulted with other attorneys who had worked death penalty cases about the best approach for Largin's case. There was evidence presented that [James] Smith researched parricide and mental health definitions, as

well as obtained a reference manual on mental disability law and evidence and the Alabama Trial Manual published by the Equal Justice Initiative. Thus, this Court finds that trial counsel adequately investigated and prepared for potential mitigation evidence in this case.

"Second, this Court finds that trial counsel made a reasonable strategic decision to call Dr. Salekin. Largin was convicted of shooting his mother and father multiple times; both died from close-range gunshots to the head. Largin [v. State], 233 So. 3d [374,] at 388 [(Ala. Crim. App. 2015)]. After murdering them, Largin tossed his parents' bodies 'down the stairs leading to the cellar in their home.' Id. Though he attempted to clean up the murder scene, he eventually gave up, stole an automobile, credit cards, and a substantial amount of cash, and set out on a cocaine binge. Id. at 388-89. This Court ultimately found two aggravating factors: Largin committed the murders during a robbery, and he murdered his parents pursuant to one act, scheme, or course of conduct.

"As the record on direct appeal reflects, counsel offered evidence to show Largin suffered from a turbulent family history and presented testimony from Dr. Salekin regarding Largin's diagnosis of narcissistic personality disorder and the relationship between his family history and his diagnosis. This Court finds that her testimony contextualized Largin's personality disorder, particularly that it explained that Largin's personality disorder amplified his reaction to conflict and explained guilt-phased testimony regarding his response to his parents' murder. Dr. Salekin testified that Largin's personality disorder was a 'severe,' 'significant mental illness,' and noted that individual therapy could work 'for someone like' him. Though she noted that characteristics of the disorder included manipulation, deceitfulness, and an inability to relate to others, she found that Largin's characteristics were 'so elevated that they impair[ed] his ability to function on a day-to-day basis, primarily … interpersonally[.]' Dr. Salekin testified that his personality

disorder was the result of both biological and environmental factors. She explained that the Largins were a 'high-conflict' family, which 'would impact child development in a sense of making them fearful.' She further explained that 'high-conflict families tend to produce individuals who have deficits in interpersonal functioning. Narcissistic personality is one step above what [you] may expect in other people in similar situations.' Dr. Salekin testified that Largin's disorder worked to amplify issues that resulted from his family history. Dr. Salekin also explained that Largin and his sister, [Sheri], shared the same behavior in conflict as that modelled by their parents, who used physical violence during confrontations. She testified that their violent response to confrontation was a 'pattern in the home that these kids learned … over the course of time.' She noted that Largin's witnessing the alleged physical abuse of his cousin, who lived in the Largin household until Largin was approximately seven years old, placed him 'in an environment where he [was] recognizing and being exposed to verbal violence ... as well as physical violence, so it would impact him.' Dr. Salekin opined that Largin's behavior in treatment facilities and his suicide attempts were consistent with his personality disorder. The suicide attempts allegedly demonstrated Largin's 'inability to make good decisions [and] his impulsive behaviors.' Further, Storie explained during the evidentiary hearing that their overall theory for mitigation was to show that Jimmy Largin 'was an abusive man' and had 'created an environment where [his children] were afraid of him … [that Largin] didn't really have much of a shot, given that environment.' He testified that '[t]he fact that there w[ere] parents involved was always an important factor because we thought a reasonable juror would ask why would a person kill their parents. That is not your typical just killing somebody because of a drug deal or whatever.' Storie testified that '[a]t the time that [he and Smith] were preparing and strategizing … [Dr. Salekin's] concerns [about her testimony] were heard and noted'; however, he and Smith 'felt that there was a possibility that [her testimony] could be helpful.' Storie further stated that

32

although Smith made the ultimate decision to call Dr. Salekin, Smith 'articulated that he felt that she would offer something that would explain the behavior that the jury had already found had taken place.'

"An examination of Smith's oral arguments contained in the transcript of the October 1, 2009, sentencing hearing … demonstrated trial counsel's trial strategy in calling Dr. Salekin. Pages 35-36 of the sentencing transcript contain the following excerpts:

> "'… Secondly, extreme mental or emotional disturbance, that he suffers from that and suffered from that at the time of the commission of the offense. The State wants to minimize the narcissistic personality disorder, but we heard Dr. Salekin testify that it was as to Mr. Largin debilitating. The problem is that narcissistic personality disorder by its very nature, its symptoms are the things that make us not like a person. Its symptom cluster is to cause a person to lie, to be manipulative, and to not understand the feelings of others. But those are symptoms of an illness, a mental or emotional disturbance, a condition over which he doesn't have control.

> "'… Thirdly, that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. And again, this was from his narcissistic personality disorder, his depression, his mental and emotional disturbance which was testified to by Dr. Salekin and which was evident in the records reviewed. She talked about the records and was questioned about the records from Bryce Hospital, from North Harbor, from Indian Rivers, from the substance abuse place in Mobile where he was, Serenity House. So

33

there was a history of problems of being able to conform his conduct to the requirements of law because of his substantial impairment caused by a mental condition over which he had no control.'

"Based on the above, this Court finds that Largin has not met his burden and shown that no reasonable attorney would have chosen to present Dr. Salekin's testimony during the penalty phase. This Court further finds that, even assuming counsel performed deficiently by calling Dr. Salekin to testify during the penalty phase, Largin has not met his burden of proving prejudice under <u>Strickland</u>. At trial, this Court determined that evidence that Largin suffered from narcissistic personality disorder was a non-statutory mitigating circumstance and considered such evidence accordingly when weighing the aggravating and mitigating circumstances. Largin has not shown that but for Dr. Salekin's testimony, he would have been sentenced to life without the possibility of parole for the murder of his parents. Accordingly, this Court finds Largin's ineffectiveness claim is without merit ...."

(C. 625-29 (some citations omitted).)

Largin argues that trial counsel's decision to call Dr. Salekin to testify was unreasonable under the circumstances. He asserts that, in calling her to testify, trial counsel disregarded Dr. Salekin's "informed and professional judgment" based on her investigation into Largin's background. He also cites Dr. Salekin's concerns about testifying and her "clear and repeated warnings" that her testimony might be more harmful than helpful. He argues that Storie's explanation—that he and Smith

knew Dr. Salekin's testimony could backfire but that they hoped it would help explain Largin's behavior—is "unavailing and begets more questions." He argues that "counsel's decision boiled down to nothing more than hope that Salekin's testimony could be more helpful than harmful." (Largin's brief, pp. 27-38.)

First, we note that Largin does not challenge the circuit court's finding that trial counsel "adequately investigated and prepared for potential mitigation in this case." (C. 626.) Instead, Largin's argument is that no reasonable attorney would have called Dr. Salekin to testify under the circumstances. This argument lacks merit.

> "'The decision to call, or not to call, an expert witness fits squarely within the realm of strategic or tactical decisions. See, e.g., Commonwealth v. Facella, 478 Mass. 393, 413, 85 N.E.3d 665 (2017) (decision not to call psychiatric expert reasonable strategic decision); Commonwealth v. Hensley, 454 Mass. 721, 739, 913 N.E.2d 339 (2009) (decision not to call expert strategic). Accordingly, we evaluate whether the decision was "manifestly unreasonable" at the time it was made. [Commonwealth v.] Holland, 476 Mass. [801] at 812, 73 N.E.3d 276 [(2017)].'"

State v. Lewis, [Ms. CR-20-0372, May 6, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022) (quoting Commonwealth v. Ayala, 481 Mass. 46, 63, 112 N.E.3d 239, 253 (2018) (footnote omitted)). See also Brown v. State, 288 Ga. 902, 909, 708 S.E.2d 294, 301 (2011) ("[A] tactical decision will

35

not form the basis for an ineffective assistance of counsel claim unless it was 'so patently unreasonable that no competent attorney would have chosen it.' McKenzie v. State, 284 Ga. 342, 347, 667 S.E.2d 43 (2008).""). Counsel's decisions are reviewed objectively, and "'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Benjamin v. State, 156 So. 3d 424, 430 (Ala. Crim. App. 2013) (quoting Strickland, 463 U.S. at 690-91.)

Largin cites several decisions for the proposition that there are "inherent dangers of evidence regarding personality disorders in death penalty cases." [6] (Largin's brief, p. 30.) Save one, those decisions involve claims that trial counsel was ineffective for not putting on evidence of a

---

[6]Largin cites Darden v. Wainwright, 477 U.S. 168, 186 (1986); Littlejohn v. Royal, 875 F.3d 548, 564 (10th Cir. 2017); Evans v. Secretary, Dep't of Corrs., 703 F.3d 1316, 1329 (11th Cir. 2013); Warden, Georgia Diagnostic Prison, 694 F.3d 1230, 1270 (11th Cir. 2012); Worthington v. Roper, 631 F.3d 487, 503 (8th Cir. 2011); DeYoung v. Schofield, 609 F.3d 1260, 1288 (11th Cir. 2010); Reed v. Secretary, Dep't of Corrs., 593 F.3d 1217, 1248 (11th Cir. 2010); Holsey v. Cummings v. Secretary for the Dep't of Corrs., 588 F.3d 1331, 1368 (11th Cir. 2009); Land v. Allen, 573 F.3d 1211, 1222 (11th Cir. 2009); Nelson v. Quarterman, 472 F.3d 287, 307-08 (5th Cir. 2006); and Guinan v. Armontrout, 909 F.2d 1224, 1230 (8th Cir. 1990).

personality disorder in the penalty phase of a capital-murder trial.[7] In each case the courts held that, under the circumstances, counsel was not ineffective. But those decisions simply do not compel the inverse conclusion that Largin's trial counsel was ineffective for putting on evidence of his personality disorder. That Largin cites no decision in which trial counsel has been found ineffective for putting on such

---

[7]In <u>Nelson v. Quarterman</u>, 472 F.3d 287, 307-08 (5th Cir. 2006), trial counsel put on evidence of a personality disorder. Largin quotes this statement from that decision:

> "[I]t is likely that a juror considering Nelson's evidence of borderline personality disorder would have felt that he could give the evidence only one possible effect via the future-dangerousness issue: Such a juror would have seen the evidence as only aggravating, because Nelson's borderline personality disorder and the difficulty of treating it increase the likelihood that Nelson will act out violently again. Consequently, there would be no vehicle to give mitigating effect to his evidence of borderline personality disorder, i.e., no way for the jury to express its conclusion that even though he is likely to be dangerous in the future, his mental illness makes him unworthy of the death penalty."

472 F.3d at 307-08. When read in context, that quote shows the problem with the former Texas statutory scheme at issue was because <u>that scheme</u> did not allow the jury to find mitigating the evidence Nelson offered about his personality disorder. The court in <u>Nelson</u> did not hold that, were it separated from the unconstitutional statutory scheme, the evidence could not have been mitigating. Thus, <u>Nelson</u> does not support Largin's position.

evidence is telling.

In <u>Morton v. Secretary, Florida Department of Corrections</u>, 684 F.3d 1157 (11th Cir. 2012), the court addressed Morton's claim that his counsel was ineffective for presenting, at the penalty phase, expert testimony about the petitioner's antisocial personality disorder. The court stated:

> "Habeas petitioners routinely ask us to rule that they received ineffective assistance when their trial lawyers failed to present evidence of an antisocial personality disorder, <u>see, e.g.</u>, <u>Reed [v. Secretary, Dep't of Corrs.]</u>, 593 F.3d [1217,] 1245-49 [(11th Cir. 2010)]; <u>Cummings [v. Secretary for the Dep't of Corrs.]</u>, 588 F.3d [1331,] 1365-68 [11th Cir. 2009)]; ... so [trial counsel] chose a mitigation strategy that many postconviction lawyers contend can be effective. Although we have stated that evidence of antisocial personality disorder is 'not "good" mitigation,' <u>Reed</u>, 593 F.3d at 1246, <u>we have never ruled that a capital defense lawyer renders ineffective assistance as a matter of law when he introduces evidence of antisocial personality disorder for mitigation purposes</u>. And for good reason. In <u>Eddings v. Oklahoma</u>, the Supreme Court of the United States explained that 'the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, <u>as a mitigating factor</u>, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' 455 U.S. 104, 110, 102 S. Ct. 869, 874, 71 L. Ed. 2d 1 (1982) (quoting <u>Lockett v. Ohio</u>, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964, 57 L. Ed. 2d 973 (1978)) (alteration and emphasis in original) (internal quotation marks omitted). And the Supreme Court ruled that a sentencing court violated the constitutional rights of the defendant by failing to consider expert testimony that the

defendant had an 'antisocial personality.' Id. at 107-08, 102 S. Ct. at 873-74.

> "In the light of Eddings, there cannot be a per se rule that a lawyer renders ineffective assistance by presenting evidence of an antisocial personality disorder for purposes of mitigation. The Supreme Court of Florida, at Morton's urging, reasonably ruled that 'antisocial personality disorder is a valid mitigating circumstance for trial courts to consider and weigh.' Morton [v. State], 789 So. 2d [324,] 329-30 [(Fla. 2001)] (citing Eddings, 455 U.S. at 110, 102 S. Ct. at 874). That a diagnosis of antisocial personality disorder has negative characteristics or presents a double-edged sword renders it uniquely a matter of trial strategy that a defense lawyer may, or may not, decide to present as mitigating evidence."

684 F.3d at 1168 (emphasis added; some citations omitted). The court also addressed Morton's argument that his counsel had performed deficiently by calling the expert, Dr. DelBeato, "to testify at the retrial of the penalty phase knowing that [he] had testified at the first penalty phase that Morton was a sociopath and shared traits in common with serial killers." 684 F.3d at 1168. Citing "Strickland's deferential standard," the court held that trial counsel

> "could have reasonably determined that Dr. DelBeato's expert testimony that Morton's childhood caused him to develop antisocial personality disorder, which led Morton to murder Weisser and Bowers, was necessary to explain to the jury why Morton's childhood might mitigate his moral culpability for the two murders. As Justice Thurgood Marshall once explained, '[e]xpert knowledge of human motivation' can be

'highly relevant in the eyes of the jurors, for it might ... offer[] an alternative explanation for why [the petitioner] killed.' Boyd v. North Carolina, 471 U.S. 1030, 1034, 105 S. Ct. 2052, 2054, 85 L. Ed. 2d 324 (1985) (Marshall, J., dissenting from denial of petition for writ of certiorari). In the absence of expert testimony that explains how a murderer's troubled past could have led him to commit a gruesome crime, Justice Marshall explained that 'scattered personal history evidence might have ... little apparent significance,' but 'expert evidence might well ... provide[] a link between the personal history evidence and that extenuation or reduction of the moral culpability of the killing that might call for a sentence of less than death.' Id.

"Expert testimony that Morton's traumatic childhood experience caused him to develop a psychological disorder that led him to murder an innocent elderly woman and her son would have provided context for Morton's mitigation case in the light of lay witness testimony presented during the resentencing. Morton's sister, Angela, testified during the resentencing that Morton suffered physical abuse from their father when Morton was a child. Angela also testified that their father raped her when she was a young girl. The problem for Morton's theory was that Angela suffered a more tragic childhood than Morton, but she was able to marry, find a job, and become a productive member of society. The horrors that Angela suffered during childhood did not cause her to become a murderer. Dr. DelBeato's expert testimony that Morton's troubled childhood caused him to develop a psychological disorder that led him to kill provided the jury with an explanation regarding why some people with troubled childhoods commit heinous crimes while others do not. [Trial counsel] could have reasonably decided that Dr. DelBeato's testimony was necessary to explain why Morton's childhood mitigated his moral culpability for the murders.

"[Trial counsel] could have also reasonably decided to call Dr. DelBeato to testify at the retrial of the penalty phase

to preempt any effort by the prosecution to prove the same thing. See Awkal v. Mitchell, 613 F.3d 629, 642 (6th Cir. 2010) (en banc) ('[K]nowing that the prosecution was going to call [the expert] anyway, Awkal's counsel opted to call [the expert] as a witness to take some of the "sting" out of [the expert's] adverse opinion by being able to present his favorable testimony first and by incorporating the negative testimony into Awkal's case-in-chief.'). Florida law provides that the prosecution 'shall be provided a full opportunity to rebut the existence of mitigating factors urged by [the defendant] and to introduce evidence tending to diminish their weight if they cannot be rebutted.' Ellis v. State, 622 So. 2d 991, 1001 (Fla. 1993). With Dr. DelBeato's testimony from the first penalty phase in hand, any prosecutor worth his salt would have attempted to use the damaging parts of that testimony to argue to the jury that, far from being mitigating, the testimony of Morton's mother, sister, and others about Morton's troubled childhood established that Morton had traits in common with serial killers and was a sociopath who could not be rehabilitated. If [trial counsel] had not called Dr. DelBeato during their case-in-chief, the prosecution could have argued that [trial counsel] were hiding unfavorable information from the jury, which would have damaged their credibility. Instead of allowing the prosecution to magnify the harmful aspects of Dr. DelBeato's testimony, [trial counsel] downplayed those aspects of Dr. DelBeato's testimony by calling him as a witness during their case-in-chief and acknowledging the negative implications of his diagnosis of antisocial personality disorder."

684 F.3d at 1169-70.

Like the petitioner in Morton, Largin has not shown that his trial counsel performed deficiently in calling an expert to testify about a personality disorder with negative characteristics. The record supports

41

the trial court's finding that "trial counsel made a reasonable strategic decision to call Dr. Salekin." (C. 626.) The record shows that the evidence against Largin was strong, including his inculpatory statements to the police that it "wasn't murder … not in a cold-blooded sense" and that he "didn't try to hide it. [He] cleaned up a little bit and said to hell with it, [he wasn't] going to mess with this." (Trial R. 1293.) Largin refused to accept responsibility for murdering his parents, and evidence showed that he lacked an emotional response when he was told about the murder of his parents. The record supports the circuit court's finding that Dr. Salekin's testimony during the penalty phase "contextualized Largin's personality disorder, particularly that it explained that Largin's personality disorder amplified his reaction to conflict and explained guilt-phase testimony regarding his response to his parents' murder." (C. 626.)

As stated above, Dr. Salekin testified that Largin's personality disorder was "severe" and a "significant mental illness" but that individual therapy could work "for someone like" him. (Trial R. 2318, 2332-33, 2338.) In Dr. Salekin's opinion, Largin's personality disorder "impair[ed] his ability to function on a day-to-day basis, primarily … interpersonally." (Trial R. 2320.) Dr. Salekin testified that she thought

that both biological and environmental factors caused his personality disorder. (Trial R. 2322, 2416.) Describing the Largin family as "high conflict," Dr. Salekin testified that those "families tend to produce individuals who have deficits in interpersonal functioning." (Trial R. 2325-26.) And she testified that Largin's personality disorder amplified issues such as "regulating his emotion and interpersonal relationships." (Trial R. 2334.)

Dr. Salekin testified that, based on her investigation, Largin's parents used physical violence during confrontations and, she said, Largin and his younger sister, Sheri Lake, learned that characteristic from their parents. (Trial R. 2326-27.) She described abuse that Largin allegedly witnessed in the household while his cousin lived with them. (Trial R. 2331-32.) Dr. Salekin stated that Largin's behavior in treatment facilities and his suicide attempts were consistent with his personality disorder. (Trial R. 2358, 2363, 2411.)

The strategic decision to present evidence of Largin's personality disorder belonged to Largin's trial counsel—not to Dr. Salekin. Largin has not shown that trial counsel's decision was deficient performance under Strickland.

43

Even if that decision were deficient performance, Largin has not shown prejudice under Strickland. The sentencing court found Largin's personality disorder to be a nonstatutory mitigating circumstance. (Trial R. 2599.) Dr. Salekin's (and Largin's) later disagreement with that finding does not negate it. "In assessing prejudice under Strickland, the question .... [i]s whether it is 'reasonably likely' the result would have been different" if counsel acted differently. Harrington v. Richter, 562 U.S. 86, 111 (2011) (citations omitted). "The likelihood of a different result must be substantial, not just conceivable." Id. Addressing a claim alleging ineffectiveness during the penalty phase where a death sentence required a unanimous jury recommendation, the United States Supreme Court held that "prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding Andrus' 'moral culpability.'" Andrus v. Texas, 590 U.S. ___, ____, 140 S. Ct. 1875, 1887 (2020) (quoting Wiggins v. Smith, 539 U.S. 510, 537-38 (2003)).[8]

---

[8]Unlike the Texas statutory scheme in Andrus, Alabama does not require the jury to be unanimous in its decision to recommend a death sentence. § 13A-5-46(f), Ala. Code 1975 ("The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors.").

The Rule 32 judge—the same judge who sentenced Largin to death—found:

> "[E]ven assuming counsel performed deficiently by calling Dr. Salekin to testify during the penalty phase, Largin has not met his burden of proving prejudice under Strickland. At trial, this Court determined that evidence that Largin suffered from narcissistic personality disorder was a non-statutory mitigating circumstance and considered such evidence accordingly when weighing the aggravating and mitigating circumstances. Largin has not shown that, but for Dr. Salekin's testimony, he would have been sentenced to life without the possibility of parole for the murder of his parents."

(C. 629.) As stated above:

> "[W]hen the same judge presides over both the original trial and the postconviction proceeding—as is the case here—and finds that, under the second prong of Strickland, trial counsel's errors would not have resulted in prejudice, '[w]e afford the experienced judge's ruling "considerable weight."' Washington v. State, 95 So. 3d 26, 53 (Ala. Crim. App. 2012) (emphasis added) (affirming the circuit court's denial of Washington's postconviction ineffective-assistance-of-counsel claim by applying the 'considerable weight' standard). See also State v. Gamble, 63 So. 3d 707, 721 (Ala. Crim. App. 2010) (affirming the circuit court's granting of Gamble's postconviction ineffective-assistance-of-counsel claim by applying the 'considerable weight' standard) (citing Francis v. State, 529 So. 2d 670, 673 n.9 (Fla. 1988) ('Postconviction relief motions are not abstract exercises to be conducted in a vacuum, and this finding is entitled to considerable weight.'))."

Marshall, 182 So. 3d at 583.

We agree with the circuit court that Largin did not show prejudice under Strickland. He did not show that, had counsel not called Dr. Salekin to testify, "[t]he likelihood of a different result [was] substantial." Id. Nor did he show "'a reasonable probability that at least one juror would have struck a different balance' regarding [Largin's] 'moral culpability.'"[9] Andrus, supra. We find no merit in Largin's assertions that his "case presents a rare situation where it is possible to objectively conclude that counsel's decision to put on a witness strengthened the State's case for death" or that Dr. "Salekin's testimony provided the bulk of the aggravating evidence against Largin." (Largin's brief, pp. 40-41, 43-44.)

Largin is due no relief on this claim.

## B.

Largin argues that "[t]he circuit court erred in denying Largin's claim [I.A.1.] that [his trial counsel were ineffective] by failing to present a credible, cohesive, and sound theory of the defense linking the guilt and penalty phases of trial." (Largin's brief, p. 44.)

---

[9]In Largin's case, the jury voted 11-1 to recommend death. Even if one more juror had voted against death, the jury still could have recommended a death sentence under § 13A-5-46(f), Ala. Code 1975.

In denying this claim, the Rule 32 court stated:

"Largin alleges that trial counsel's decision to deny guilt during the guilt phase while then presenting mitigating evidence to explain why he murdered his parents during the penalty phase was ineffective assistance because it presented 'conflicting' theories of defense to the jury. Notably, '[t]rial counsel's decisions regarding what theory of the case to pursue represent the epitome of trial strategy.' Clark [v. State], 196 So. 3d [285,] 306 (Ala. Crim. App. 2015)] (citation omitted). Simply because counsel's 'defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient.' Id. (internal citations omitted). With these concepts in mind, this Court finds that Largin has not shown that trial counsel provided ineffective assistance based on the theory of defense counsel presented at trial ….

"First, this Court notes that it presided over Largin's trial and heard strong evidence that Largin murdered his parents, including his inculpatory statements to Investigator Miller. Second, this Court notes that lead counsel, James Smith, was an experienced criminal defense attorney who had previously tried multiple capital murder cases before representing Largin. In his petition, Largin argues that trial counsel should have presented a defense wherein Largin accepted responsibility for his parents' murders to 'harmonize' the guilt phase with the mitigation evidence presented during the penalty phase. This Court finds, however, that there was no evidence offered during the evidentiary hearing to indicate that such a theory of defense was plausible. Indeed, Leon Storie testified that Largin's case was difficult because there was strong evidence of Largin's guilt and Largin had confessed to Investigator Miller. Storie also testified that although a plea agreement was reached, Largin refused to admit and accept responsibility for his parents' murder. This is further reflected in the record on direct appeal and from this Court's own recollection of the pretrial and trial

47

proceedings wherein Largin refused to admit guilt to the murder of his parents. Thus, given his adamant denial of guilt, Largin has not shown by a preponderance of the evidence that trial counsel performed deficiently when counsel failed to present a theory of defense wherein Largin accepted responsibility for his parents' murder or shown that but for counsel's actions, the outcome of his case would have been different. Further, this is not a case where trial counsel were unaware of a plausible alternative theory of defense. See Brownfield v. State, 266 So. 3d 777, 802 (Ala. Crim. App. 2017) ('[I]f an attorney is aware of a line of defense and makes a conscious decision to reject it, rather than failing to raise it simply because he was unaware that it existed, it is more likely that the failure to raise the defense was reasonable.'). Rather, as Storie testified during the evidentiary hearing, once plea negotiations broke down, trial counsel were left with presenting a defense of 'basic reasonable doubt' or 'offer[ing] an alternative scenario for the jury to consider.' Storie also testified that although there was concern about presenting the theory of an alternative suspect while presenting mitigating evidence during the penalty phase, he and lead counsel (Smith) would have discussed how to best link potential theories of defense presented during both phases of trial. … Storie explained that he and Smith would have discussed the way to counteract the potential inconsistency. Largin has not shown that this strategic decision was outside the wide range of reasonable professional assistance or that no competent attorney would have chosen it. He has also failed to show that any alternative theory of defense—let alone one that admitted guilt—was available to trial counsel given Largin's demonstrated unwillingness to admit guilt or that presenting such an alternative theory would have changed the outcome of his case. See Strickland, 466 U.S. at 687; see also Brownfield, 266 So. 3d at 802; Clark, 196 So. 3d at 306. As such, this Court finds Largin failed to show that his counsel presented 'conflicting' theories of defense and he did not meet his burden of establishing prejudice."

48

(C. 623-25 (some citations omitted).)

On appeal, Largin argues that a conviction was "all but certain" and that "reasonably prudent counsel would not have embarked on a guilt-phase strategy so incompatible with the defense's theory for sentencing." (Largin's brief, p. 47.) He asserts that counsel should have "pursue[d] a theory that recognized the strength of the State's case against Largin, laid the groundwork to make a case of life in mitigation, maintained credibility in the eyes of the sentencer, and … present[ed] evidence that would only help, not hurt, Largin's case for innocence." (Id.) Largin also argues that counsel's alleged ineffectiveness in calling Dr. Salekin "bleed[s] into this claim as well." (Id.) Finally, Largin argues that "[c]ounsel's theory of defense was concerning enough that the circuit court recognized the dangers of the course counsel was following," even, Largin says, "warn[ing] the defense about its perceived dangers of continuing to vilify Sheri Largin Lake to the jury." (Id.)

First, as we held above, counsel was not ineffective in calling Dr. Salekin to testify. There is thus no alleged ineffectiveness in that decision to "bleed" into Largin's claim I.A.1.

Second, as for the circuit court's statements about Largin's

49

approach toward Sheri, the record shows that trial counsel argued that counsel was offering this evidence not to attack Sheri but to offer evidence about Largin's turbulent family history. (Trial R. 2249-54.) After the circuit court confirmed that Dr. Salekin found this evidence relevant during her assessment, the circuit court gave trial counsel a chance to discuss this strategy with Largin before continuing the penalty phase. (Trial R. 2255-56, 2269.)

Third, as the circuit court recognized in denying relief:

> "'"Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel." People v. Eisemann, 248 A.D.2d 484, 484, 670 N.Y.S.2d 39, 40-41 (1998).'
>
> "Davis v. State, 44 So. 3d 1118, 1132 (Ala. Crim. App. 2009). '"The fact that [a] defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient."' Bush v. State, 92 So. 3d 121, 160-61 (Ala. Crim. App. 2009) (quoting Heath v. State, 3 So. 3d 1017, 1029 (Fla. 2009)). See also Johnson v. State, 769 So. 2d 990, 1001 (Fla. 2000) ('"Simply because the ... defense did not work, it does not mean that the theory of the defense was flawed."' (citations omitted))."

Clark v. State, 196 So. 3d 285, 306 (Ala. Crim. App. 2015). And "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691.

Storie testified that, after Largin refused the plea deal, their options for a guilt-phase theory were to "rely on basic reasonable doubt" or "offer an alternative scenario" that someone else committed the murders. (R. 61, 84.) He testified that "we ultimately went with offering an alternative scenario."

The record shows that during the State's case-in-chief, George McShan, an inmate who was incarcerated with Largin, testified that Largin told him that he planned to tell his attorneys that "his sister [was] involved … because his sister had assaulted his mama and father in the past. And he said he was going to let them know that his sister had just as much motive for killing his mom and dad as—just as much motive as he had." (Trial R. 1534.)

Largin has not shown that trial counsel's strategies at the guilt and penalty phases were unreasonable. As noted above, the case against Largin was strong, and the evidence shows that he refused to take responsibility and showed no remorse. In the face of that evidence, Largin's refusal to admit guilt affected the trial strategies available to his attorneys.

And even if counsel pursued inconsistent theories in the guilt phase

and penalty phase of the trial, it would not mean that counsel was ineffective. As we recently stated:

> "[N]umerous courts have held that it does not rise to the level of ineffective assistance of counsel for an attorney to argue inconsistent theories of the case.
>
>> "'"[I]t is not uncommon for lawyers to argue inconsistent defenses." [State v.] Westmoreland, 2008 WI App 15, ¶ 21, 307 Wis. 2d [429] at 440, 744 N.W.2d [919] at 925 [(2008)]. See also State v. McDonald, 144 Wis. 2d 531, 533, 424 N.W.2d 411, 412 (1988) (Defendant "entered pleas of not guilty and not guilty by reason of mental disease or defect," contending that he did not kill the victim but was not responsible if he did.); State v. Nelis, 2007 WI 58, ¶ 20, 300 Wis. 2d 415, 424, 733 N.W.2d 619, 623 ("Nelis argued at trial that the evidence did not show that he and Diane S. had sexual intercourse on the night at issue. He further argued that, even if they did have sexual intercourse that night, it was consensual."); Brown v. Dixon, 891 F.2d 490, 494-495 (4th Cir. 1989) (Inconsistent defenses "that Brown either did not commit the murders or did so while drunk" was not ineffective assistance of counsel.).
>>
>> "'....
>>
>> "'In light of the not uncommon practice of lawyers to argue inconsistent theories, we cannot say that the decision of Dekoria Marks's trial lawyer to argue them here deprived her of the right to constitutionally effective assistance, irrespective of whether we or the trial court view that strategy as the best. As we noted in Westmoreland, 2008 WI App 15, ¶ 21, 307 Wis. 2d

> at 440, 744 N.W.2d at 925: "As <u>Strickland</u> reminds us, there is a 'wide range of professionally competent assistance,' <u>id.</u>, 466 U.S. at 690, 104 S. Ct. 2052, and the bar is not very high, see <u>Yarborough v. Gentry</u>, 540 U.S. 1, 11, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (lawyer need not be a Clarence Darrow to survive an ineffectiveness contention)."'

"<u>State v. Marks</u>, 330 Wis. 2d 693, 706-08, 794 N.W. 2d 547, 554-55 (Wis. Ct. App. 2010)."

<u>State v. Lewis</u>, ___ So. 3d at ___.

Largin is due no relief on this claim.

## II. SUMMARILY DISMISSED CLAIMS

The circuit court summarily dismissed the rest of Largin's ineffectiveness claims as insufficiently pleaded or lacking merit. Largin argues that, in doing so, the circuit court abused its discretion. We address Largin's arguments in turn.

### A.

In claim I.A.2., Largin alleged that his trial counsel did not investigate his "history of traumatic brain injury and headaches." (Largin's brief, p. 51.) In support of this claim, Largin alleged that he "has a long medical history of traumatic brain injuries and headaches"; that he told "counsel about this history and problems"; and that his trial

53

counsel did not investigate "into head injuries that could have caused brain damage." (C. 74-75.) Largin alleged that, as a toddler, "he was involved in a car wreck," his "head flew into the dashboard and split it open," and he was treated for his injuries at DCH Regional Medical Center in Tuscaloosa. (C. 75.) He alleged that he was involved in another car wreck as a junior in high school, that his head was "split open" when he "collided with the front passenger window," and that he received treatment at DCH for that injury also. (C. 75.) Largin alleged that he "suffered head injuries" while playing football; that at age 22, he "began suffering crippling headaches … that would begin late in the day and grow until the point that he could hardly function later in the evening"; that "[f]or years [he] was treated by Dr. Robert Ford, a board-certified neurologist, of the Ford Headache Clinic in Birmingham," who "learned that blood was not flowing evenly to both hemispheres of Mr. Largin's brain"; and that "Dr. Ford prescribed Lortabs to help Mr. Largin with the pain and Xanax to help him sleep." (C. 75-76.) Largin alleged that his "[t]rial counsel completely failed to investigate how Mr. Largin's repeated and severe head injuries might affect his mental functioning" and "completely failed to investigate Mr. Largin's history with extreme

54

headaches." (C. 76.) Largin alleged that "[a]ll of these medical records would have been available through DCH Regional Hospital in Tuscaloosa or through the Ford Headache Clinic in Birmingham." (C. 76-77.) Largin alleged that because his trial counsel did not "investigate Mr. Largin's traumatic brain injury, the jury was erroneously informed that Mr. Largin had no organic brain damage." (C. 77.)

Citing the pleading requirements of Rule 32 and this Court's decision in <u>McMillan v. State</u>, 258 So. 3d 1154, 1178 (Ala. Crim. App. 2017), the circuit court denied this claim as insufficiently pleaded. The court found: "Largin does not assert that he has ever been diagnosed with organic brain damage despite alleging that he had received treatment 'for years' from neurologist Dr. Robert Ford. Moreover, neither the psychologist who perform[ed] Largin's court-ordered competency evaluation nor Dr. Salekin recommended further testing."[10] (C. 611.)

_____

[10]The report from the competency evaluation noted that Largin did not report "any significant developmental or medical problems arising during his early childhood" but did disclose "a limited history of a motor vehicle accident" that "required stitches/sutures to close the wound," as well as possible concussions and "headache issues." Largin "denied any additional history of seizure, blackout, fainting, or vertigo." (Trial C. 392.) Dr. Salekin testified that she reviewed Largin's psychological and medical records, including records from North Harbor, Indian Rivers

In <u>McMillan</u>, the circuit court summarily dismissed McMillan's claim that "his trial counsel should have investigated and presented evidence that he suffered from fetal alcohol syndrome and a traumatic brain injury." 258 So. 3d at 1177. The circuit court stated, in part:

"'Based on the record before this Court, McMillan cannot prevail even if the facts in his amended petition are taken as true. Trial counsel obtained records, spoke to family members, hired a mitigation investigator, obtained the services of Dr. Ackerson [a board-certified forensic psychologist], spoke to a former social worker who knew McMillan during his time with DHR and obtained the benefit of a court-ordered evaluation. The penalty phase of trial shows that a great deal of effort went into preparing for the penalty phase and crafting an appropriate strategy. Trial counsel's performance in this matter was within the level of reasonable performance that is required by <u>Strickland [v. Washington</u>, 466 U.S. 668 (1984)].... The petition does not uncover the existence of documents which went undiscovered by trial counsel or that clearly document the existence of medical conditions that were overlooked by defense counsel. Instead, McMillan asserts his defense team should have been more creative in coming up with new diagnosis previously unmade during his life. Such a claim, in this case, does not constitute ineffectiveness under either prong of the <u>Strickland</u> analysis. As such, this claim is dismissed.'"

258 So. 3d at 1178 (quoting the circuit court's order). In affirming the summary dismissal of this claim, this Court stated:

"McMillan's entire pleading on this claim is based on

_____

Crisis Stabilization Unit, Bryce Hospital, and Serenity Care, Inc. (Trial R. 2308, 2344, 2346.)

speculation. McMillan did not plead in either his original petition or his amended petition that he actually suffered from fetal alcohol syndrome or that he had been diagnosed with traumatic brain injury. Indeed, the entire argument is premised on the fact that counsel 'should have investigated' and 'might have found' that McMillan suffered from those conditions. '[B]y presenting pure speculation and failing to plead any specific facts regarding [this issue] ... [the appellant] failed to plead facts supporting a general claim of prejudice.' Morris v. State, [261] So. 3d [1181, 1192] (Ala. Crim. App. 2016). 'Ineffective assistance of counsel claims are not built on retrospective speculation ....' Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). 'It is well established that, in a claim of ineffective assistance of counsel, "[m]ere conjecture and speculation are not enough to support a showing of prejudice."' Elsey v. Commissioner of Corr., 126 Conn. App. 144, 166, 10 A.3d 578, 593 (2011) (citation omitted). This circuit court properly dismissed this claim because no material issue of law or fact exists that would entitle McMillan to relief. See Rule 32.7(d), Ala. R. Crim. P."

258 So. 3d at 1178-79. On appeal, Largin does not address McMillan; he merely asserts that the circuit court was wrong in its conclusion. This does not satisfy Rule 28(a)(10), Ala. R. App. P., which requires that an argument include "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." "'"It is not the function of this Court to .... to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument."'" Ex parte Borden, 60

So. 3d 940, 943 (Ala. 2007) (quoting Butler v. Town of Argo, 871 So. 2d 1, 20 (Ala. 2003), quoting in turn Dykes v. Lane Trucking, Inc., 652 So. 2d 248, 251 (Ala. 1994)).

Largin did not sufficiently plead this claim, and the circuit court did not err in summarily dismissing it. See, e.g., McMillan, supra.

B.

In claim I.A.3., Largin alleged that "[t]rial counsel was ineffective for failing to seek funds to hire an expert to explain the mitigating effects of Mr. Largin's brain injuries." (C. 77.) Largin alleged that "it is likely that Mr. Largin has organic brain damage of which the sentencer was not informed." (C. 78.) Largin alleged that "[b]ecause of the trial attorney's failed investigation and failure to obtain the appropriate expert, the sentencer was denied the opportunity to hear that Mr. Largin was in two serious car accidents when he was younger, suffered head injuries because of the accidents, and suffered from extreme headaches stemming from reduced blood flow within his brain," and "[t]he sentencer never got to hear from a neuropsychologist or neurologist about the effects of traumatic brain injury or the headaches, or to see the results of a scan to determine exactly what type of brain damage occurred." (C. 79.) Citing

58

the pleading requirements of Rule 32 and <u>Lee v. State</u>, 44 So. 3d 1145, 1166-67 (Ala. Crim. App. 2009), the circuit court summarily dismissed this claim as insufficiently pleaded because Largin did "not identify an expert by name or explain the content of that expert's expected testimony." (C. 611.) In <u>Lee</u>, this Court stated: "'We have held that a petitioner fails to meet the specificity requirements of Rule 32.6(b), Ala. R. Crim. P., when the petitioner fails to identify an expert by name or plead the contents of that expert's expected testimony.'" 44 So. 3d at 1166-67 (quoting <u>Smith v. State</u>, 71 So. 3d 12, 33 (Ala. Crim. App. 2008), <u>overruled on other grounds by</u> <u>Ex parte Lane</u>, 286 So. 3d 61 (Ala. 2018)). On appeal, Largin does not address <u>Lee</u>; he merely asserts that he sufficiently pleaded his claim. This does not satisfy Rule 28(a)(10), Ala. R. App. P.

Largin did not sufficiently plead this claim, and summary dismissal was proper. <u>See, e.g.</u>, <u>Lee</u>, <u>supra</u>; <u>Jackson v. State</u>, 133 So. 3d 420, 452 (Ala. Crim. App. 2009).

C.

In claim I.A.4., Largin alleged that his counsel "could have obtained funds to hire a neuropharmacologist to testify about the relationship

between his brain damage and his known drug use." (C. 80.) Largin alleged that he had "used drugs throughout his life" and that "[a] neuropharmacologist would have been able to explain to the jury the interplay between Mr. Largin's organic brain issues and the drugs he was using around the time of the offense." (C. 80.) Largin alleges that his counsel's failure to hire a neuropharmacologist "denied [the sentencer] the opportunity to consider the way that substances chemically altered Mr. Largin's brain on the night of the crime." (C. 81.)

For the same reasons it dismissed claim I.A.3., the circuit court summarily dismissed this claim as insufficiently pleaded. (C. 612.) On appeal, Largin does not address the circuit court's reasoning, other than asserting that he sufficiently pleaded his claim. He did not. See, e.g., Lee, supra; Jackson, supra.

D.

In claim I.B.1., Largin alleged that his trial counsel should have objected to testimony from Lt. John Arnold, Sgt. John Nabors, and Paul McNutt about Largin's demeanor after he was arrested. (C. 100.) Largin alleged that their testimony and a comment about his testimony during the State's rebuttal violated Ex parte Marek, 556 So. 2d 375 (Ala. 1989).

60

On direct appeal, this Court found no plain error in the admission

of this evidence:

> "Largin argues that the trial court erred when it permitted two officers [Lt. John Arnold and Sgt. John Nabors] to testify about his demeanor at the time of his arrest, specifically, that, when he was taken into custody, he did not appear to be very surprised, he did not protest, and he did not ask the reason for his detention. He further argues that the trial court erred when it permitted Paul McNutt to testify that after he and Largin were taken into custody when they came out of the apartment, he heard the word 'homicide' over a police radio, and he assumed Largin heard it, but he did not observe any reaction from Largin. According to Largin, this testimony—and the prosecutor's comment on the testimony during rebuttal closing argument—was a violation of Ex parte Marek, 556 So. 2d 375 (Ala. 1989), which abolished the tacit-admission rule in pre-arrest situations.

> "....

> "The Marek Court stated that a tacit admission

> "'is made when "a statement incriminating [the] accused or charging him with crime is made in his presence and hearing, under circumstances naturally calling for a reply or denial, and he has full liberty to speak"; in such a case "his silence or failure to reply or deny is admissible in evidence as an admission of the statement or accusation; where, on being accused of crime, with full liberty to speak, one remains silent, his failure to reply or to deny is relevant as tending to show his guilt." 22A C.J.S. Criminal Law, § 734(1) at 1068-69 (1961). (Footnotes omitted.)'

"556 So. 2d at 379.

"As the Court made clear in <u>Marek</u>, a statement incriminating the accused or charging him with crime 'under circumstances naturally calling for a reply or denial' is a necessary predicate to a tacit admission. None of the testimony to which Largin now objects involved such a statement. Therefore, there was no tacit admission. <u>Alexander v. State</u>, 601 So. 2d 1130, 1132 (Ala. Crim. App. 1992). Because there was no tacit admission, the prosecutor's reference to that testimony in rebuttal closing argument did not violate the prohibition against tacit-admission testimony.

"Furthermore, no error resulted from that testimony because evidence of a defendant's demeanor before or after the offense is admissible at trial. <u>E.g.</u>, <u>Pressley v. State</u>, 770 So. 2d 115 (Ala. Crim. App. 1999); <u>Lowe v. State</u>, 627 So. 2d 1127 (Ala. Crim. App. 1993); <u>Sheridan v. State</u>, 591 So. 2d 129 (Ala. Crim. App. 1991). Likewise, because the testimony was properly admitted, the prosecutor's reference to that testimony in closing argument was not error. <u>Alexander</u>, 601 So. 2d at 1132."

<u>Largin</u>, 233 So. 3d at 397-98.

In <u>Woodward v. State</u>, 276 So. 3d 713, 768-69 (Ala. Crim. App. 2018), the circuit court rejected a petitioner's claim that his counsel was ineffective for not objecting to certain testimony. The circuit court relied on this Court's holding in the petitioner's direct appeal that the underlying claim had no merit. On appeal, the petitioner argued "that the circuit court's finding that claim was meritless because it was rejected by this Court on direct appeal" conflicted with <u>Ex parte Taylor</u>, 10 So. 3d

62

1075 (Ala. 2005). This Court disagreed:

> "In Ex parte Taylor, the Alabama Supreme Court held that 'a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel.' 10 So. 3d at 1078. However, Ex parte Taylor applies only to the prejudice prong of Strickland, not to the deficient-performance prong. See Clark v. State, 196 So. 3d 285, 311 n.4 (Ala. Crim. App. 2015). Because this Court's holding on direct appeal establishes that counsel's performance was not deficient, Ex parte Taylor is inapplicable."

Woodward, 276 So. 3d at 769.

Relying on that principle from Woodward and citing this Court's holding on direct appeal in Largin that there was no tacit admission and thus no violation of Marek, the circuit court summarily dismissed this claim. (C. 612-13.) On appeal, Largin does not address Woodward or this Court's holding in Largin that there was no tacit admission and thus no violation of Marek, nor does he address the circuit court's reliance on that holding in Largin. This Court's holding in Largin refutes the claim on which Largin bases his argument that his counsel's performance was deficient. Because there was no tacit admission, counsel's failure to object was not deficient performance. See, e.g., Carruth v. State, 165 So. 3d 627, 641 (Ala. Crim. App. 2014) (counsel is not ineffective for failing to raise a

63

meritless objection); <u>Yeomans v. State</u>, 195 So. 3d 1018, 1034 (Ala. Crim. App. 2013) ("[B]ecause there is no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed.").

Largin is due no relief on this claim.

E.

In claim I.B.2., Largin alleged that counsel should have objected to evidence of "prior bad acts." (Largin's brief, p. 62.) Largin alleged four "different issues under [Rule] 404(b)," Ala. R. Evid., in which he says counsel was ineffective: (1) for not objecting to "George McShan's testimony that Largin made statements about committing other murders (Trial R. 1538)"; (2) for not objecting to "numerous instances of Rule 404(b) evidence about Largin being prone to anger, violence, and bizarre behavior (Trial R. 833-44; 885; 886-87; 945; 985; 1017-19; 1111; 1115; 1126-34; 1196)"; (3) for not objecting to "the lack of notice from the State regarding Rule 404(b) evidence"; and (4) for not "request[ing] a limiting instruction regarding the Rule 404(b) evidence presented by the State." (Largin's brief, p. 63.)

The Rule 32 court summarily dismissed this claim. (C. 613.) The court found:

"[T]hese underlying substantive claims were subjected to plain-error review. <u>Largin</u>, 233 So. 3d at 398. There, Largin argued that testimony from McShan regarding Largin's statement about two additional murders, testimony of his 'extensive history of drug abuse and some of the behaviors he exhibited as a result of his drug abuse,' and the trial court's failure to give a limiting instruction on either resulted in reversible error. <u>Id.</u> In each instance, the appellate court held that no error, let alone plain error, occurred. <u>Id.</u> at 399-401. Thus, this claim is summarily dismissed because Largin has not pleaded facts sufficient to show that counsel's failure to raise these objections resulted in deficient performance. <u>Woodward</u>, 276 So. 3d at 769."

(C. 613.)

On appeal, Largin does not address <u>Woodward</u> or this Court's holdings on direct appeal about the evidence to which he alleges his counsel should have objected. Largin's complete argument in support of the above issues is:

"Had counsel objected, the circuit court would have excluded or severely limited any Rule 404(b) evidence and issued instructions to the jury regarding the proper uses and limitations of this evidence. But counsel failed to do so. Because counsel failed to do so, counsel performance [sic] deficiently in a manner that prejudiced Largin with the jury.

"In his petition, Largin satisfied th[e] pleading requirements of Rules 32.3 and 32.6(b) and <u>Hyde</u>. Largin's petition detailed facts that, if true, would entitle Largin to relief on this claim. <u>Hyde</u>, 950 So. 2d at 356. Therefore, this Court should reverse the circuit court's summary dismissal of claim [I.B.2.] and remand for further proceedings."

65

(Largin's brief, p. 64.) This argument does not comply with Rule 28(a)(10), Ala. R. App. P. See, e.g., Ex parte Borden, 60 So. 3d at 943; Egbuonu v. State, 993 So. 2d 35, 38-39 (Ala. Crim. App. 2007) ("'Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.' Hamm v. State, 913 So. 2d 460, 486 (Ala. Crim. App. 2002). 'Authority supporting only "general propositions of law" does not constitute a sufficient argument for reversal.' Beachcroft Props., LLP v. City of Alabaster, 901 So. 2d 703, 708 (Ala. 2004), quoting Geisenhoff v. Geisenhoff, 693 So. 2d 489, 491 (Ala. Civ. App. 1997)."). Merely listing issues without further explanation does not comply with Rule 28(a)(10). Morris v. State, 261 So. 3d 1181, 1198 (Ala. Crim. App. 2016) ("[The appellant] has provided no recitation of the facts relied upon in support of his argument; he merely refers to the record without setting forth any facts regarding why he believes he was entitled to relief. '[M]erely referring to the record without setting forth the facts in support of an argument is not sufficient to comply with Rule 28(a)(10), Ala. R. App. P.' L.J.K. v. State, 942 So. 2d 854, 868 (Ala. Crim. App. 2005).").

Except for the claim about the alleged lack of notice, this Court on

direct appeal addressed the issues on which Largin bases these ineffectiveness claims and held that they lacked merit. Largin, 233 So. 3d at 398-401. Largin has not addressed these holdings, and we will not repeat them here. But those holdings show he is due no relief on those issues. See, e.g., Carruth, 165 So. 3d at 641. See also McNabb v. State, 991 So. 2d 313, 326 (Ala. Crim. App. 2007) ("Here, in our opinion on return to remand in McNabb's direct appeal, this Court noted that we found 'no error, plain or otherwise, in the guilt phase of the proceedings ....' McNabb [v. State], 887 So. 2d [929,] 990 [(Ala. Crim. App. 2001)] (emphasis added). Thus, we did not limit our findings to the lack of plain error, but rather we found no error, a finding which includes a preserved-error review.").

As for his claim about the State not giving notice of its intent to use Rule 404(b) evidence, Largin did not identify what evidence was admitted without notice or explain how the alleged lack of notice for such evidence prejudiced his case. Thus, he did not sufficiently plead the claim.

## F.

In claim I.B.3., Largin alleged that his counsel were ineffective for not raising "proper challenges during jury selection." (Largin's brief, p.

64.) He argues that "[c]ounsel should have more effectively argued that the State used its peremptory strikes in a discriminatory manner in violation of <u>J.E.B. v. Alabama</u>, 511 U.S. 127 (1994), and <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986)." (Largin's brief, pp. 64-65.)

> The circuit court, in summarily dismissing this claim, noted:

> "[Largin] asserts that counsel should have argued that [76] percent of the prosecution's strikes were improperly used to remove women solely based on gender and alleges that this Court 'would have found a prima facie case of discrimination and forced the prosecution to give gender-neutral reasons for its strikes.'"

(C. 614.) The circuit court dismissed the claim as insufficiently pleaded based on this Court's rejection of the underlying claim on direct appeal, in which we stated:

> "Largin argues that the large number of peremptory strikes exercised against women was indicative of a gender bias that establishes a prima facie case of discrimination. He states: 'A defendant can establish a prima facie <u>J.E.B.</u> claim solely on the fact that a prosecutor used a large number of peremptory challenges to strike female prospective jurors.' (Largin's brief, at pp. 45-46.) Largin is incorrect. This Court repeatedly has held that a prima facie case of discrimination under <u>Batson</u> cannot be established by numbers alone. E.g., <u>Luong v. State</u>, 199 So. 3d 173 (Ala. Crim. App. 2015), and cases cited therein. Furthermore, the fact that 6 of the 12 jurors and that both alternate jurors were women must be taken into account when considering whether the State exercised its peremptory challenges in a discriminatory manner, because it indicates that the State did not use all of its peremptory challenges to

exclude women from the jury. The State's use of 22 of 29 strikes against female veniremembers does not raise an inference of discrimination."

Largin, 233 So. 3d at 403.

On appeal, Largin does not address that holding in Largin. This Court's holding in Largin shows that the claim underlying the allegation of ineffectiveness lacks merit. Thus, Largin is due no relief. See, e.g., Carruth, 165 So. 3d at 641.

## G.

In claim I.B.4., Largin alleged that his counsel should have sought funds to retain an expert to assist with jury selection. (C. 116.) Largin alleged that his "trial utilized a large potential venire and an expert was clearly needed to adequately challenge the State's peremptory strikes … and to ensure the fairness and impartiality of the jury." (C. 117.) He asserted that "[c]ounsel simply was not prepared and equip[ped] to analyze the juror questionnaires … and conduct a thorough voir dire to ensure the empaneled jurors would all consider his case fairly and fully." (C. 117.)

In summarily dismissing this claim, the circuit court found:

"The record on direct appeal refutes this claim and shows that counsel did, in fact, request and obtain funds for a juror

consultant. (Trial C. 287-92.)   Moreover, Largin does not identify the expert whom trial counsel should have retained or explain how this consultant would have affected the jury selection process. As such, this claim is summarily dismissed as insufficiently pleaded."

(C. 614.)  On appeal, Largin does not address the circuit court's findings. He merely reiterates the allegations he made in his petition and asserts that the claim was sufficiently pleaded. The circuit court did not err in summarily dismissing this claim.  See, e.g., Lee, 44 So. 3d 1166-67. See also McNabb v. State, 991 So. 2d 313, 320 (Ala. Crim. App. 2007) ("[B]ecause this claim was clearly refuted by the record, summary denial was proper pursuant to Rule 32.7(d), Ala. R. Crim. P.  See Duncan v. State, 925 So. 2d 245 (Ala. Crim. App. 2005) (adopting trial court's findings that summary dismissal of petition was proper where the claims were refuted by the record on direct appeal).").

## H.

In claim I.B.5., Largin alleged that his "counsel failed to object to the introduction of highly inflammatory victim-impact evidence during the [guilt] phase."  (C. 118.)  He alleged that "counsel allowed the State to elicit powerful victim-impact testimony from Sheri Largin Lake … and [from inmate] George McShan." (C. 118.)  Sheri testified that "as a result

of what [she] saw that night" that she found her parents' bodies, she had been seeing a therapist and had been diagnosed with "post-traumatic stress disorder and depression." (Trial R. 900.) She also testified that her therapist had advised her not to testify. (Trial R. 900-01.) McShan testified that part of his motivation for testifying against Largin was his sympathy for Sheri. (Trial R. 1543.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded because it did not include "any factual allegation to suggest that this testimony influenced the jury's decision or explain how the outcome of his case would have been different if counsel had raised an objection." (C. 615.) The circuit court also cited this Court's rejection of the underlying claim on direct appeal, in which we found no plain error:

> "Largin next argues that the trial court erred when it admitted victim-impact evidence during the guilt phase of trial. Specifically, he argues that Largin's sister, Sheri, impermissibly testified that she had a young son and as to the effect the victims' deaths had on her and her son, including her treatment by a therapist for post-traumatic stress disorder and the identification of her therapist, who was in the courtroom. Largin further argues that the trial court erred when it permitted inmate George McShan to testify that he broke the inmates' 'code of silence' and testified against Largin at least in part because he felt sorry for Sheri. He argues that his conviction should be reversed because the

71

testimony had no purpose except to encourage jurors to identify with Sheri in her grief and to bias the jurors against him.

"While the State was questioning Sheri about her observations at the crime scene when she arrived at her parents' house to check on them, Sheri testified that she saw blood on the floor. The State said it would not show her any photographs of what she saw on the floor and asked whether she had asked that she not be shown any photographs. Sheri confirmed that. The State then asked whether she was seeing a therapist as a result of what she saw that night, and she said she had been diagnosed with post-traumatic stress disorder and depression, that she was seeing a therapist, and that she was testifying against the therapist's advice. Because the State was not going to show Sheri available photographs of the crime scene to corroborate her testimony about her observations, her testimony about seeing a therapist provided an explanation for that. Therefore, the testimony was relevant and was not victim-impact testimony, and its admission was not in error. Even if that portion of Sheri's testimony could be considered irrelevant victim-impact testimony, its admission would not constitute plain error. The admission of victim-impact evidence during the guilt phase of a capital-murder trial may be harmless under Rule 45, Ala. R. App. P. E.g., Russell v. State, [261] So. 3d [397,] [422] (Ala. Crim. App. 2015)[, judgment vacated on other grounds, 137 S. Ct. 158 (2016)].

> "'It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the appellant] did not receive a fair trial simply because the jurors were told what they probably had already suspected— that [the victim] was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse,

parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in <u>Payne v. Tennessee</u>, 501 U.S. 808, 838 (1991)).'

"<u>Ex parte Rieber</u>, 663 So. 2d 999, 1006 (Ala. 1995).

"We have examined the record as a whole and we cannot conclude that Sheri's brief testimony about her diagnosis and about seeing a therapist 'probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.' <u>Ex parte Rieber</u>, 663 So. 2d at 1006. The record shows that the admission of this portion of Sheri's testimony was brief and that it did not deprive Largin of a fair trial or otherwise prejudice any of his substantial rights. Furthermore, the trial court instructed the jury repeatedly that it must base its decision solely on the evidence and the law, and that it must not … permit emotion, sympathy, or prejudice to influence its verdict. 'It is well settled that jurors are presumed to follow, not disregard, the trial court's instructions.' <u>Brooks v. State</u>, 973 So. 2d 380, 409 (Ala. Crim. App. 2007). Therefore, even if Sheri's testimony about her diagnosis and treatment was admitted in error, the error would not rise to the level of plain error.

"….

"Largin argues that the trial court erred when it permitted George McShan to testify that his sympathy for Sheri was his primary motivation for testifying. He further argues that the trial court then highlighted this emotional connection by permitting the State to introduce McShan to Sheri while McShan was on the witness stand. We review these arguments for plain error only, because Largin did not raise these objections at trial. McShan testified that he identified with Sheri because, he said, 'I put myself in her place when I lost my father. See, my father was killed....

> That's when my life started going downhill.' (R. 1543.) Even if that portion of McShan's testimony and the introduction of Sheri to McShan were irrelevant, our review of the entire record clearly demonstrates that these events did not have an unfair prejudicial impact on the jury's deliberations or otherwise prejudice his substantial rights. The testimony and introduction were brief and innocuous. Moreover, the jurors were instructed that their verdict must be based on the evidence and the law, and not emotion, sympathy, or prejudice, and jurors are presumed to follow the trial court's instructions."

Largin, 233 So. 3d at 411-13.

On appeal, Largin does not address these holdings in Largin. This Court's opinion in Largin shows that the claims underlying the allegation of ineffectiveness lack merit. The circuit court did not err in summarily dismissing this claim, and Largin is due no relief. See, e.g., Carruth, 165 So. 3d at 641.

## I.

In claim I.B.6., Largin alleged that his trial counsel were "ineffective for failing to object to several instances of prosecutorial misconduct during the guilt phase of trial." (C. 121.)  He alleged that counsel should have objected when:

(1)    "[T]he prosecutor made improper comments during voir dire by repeatedly injecting himself personally into the case through statements such as 'I'm trying to use our system of justice to kill this man.'" (C. 121, quoting Trial R. 643-44.)

74

(2)     "[T]he prosecutor also presented to the venire an extended, graphic, and improper account of how chickens are killed in a barnyard with the bare hands. This unnecessary statement served to dehumanize the defendant and inflame the passions of the jury by comparing the situation of a capital juror to one who is asked to kill an animal." (C. 122, citing Trial R. 654, 658-59.)

(3)     "[T]he prosecutor elicited improper testimony from jailhouse informant George McShan about a supposed 'code of silence' among prison inmates and the fact that McShan was breaking this supposed code because (1) Mr. Largin's act of killing his parents was beyond the pale even among prisoners; and (2) McShan was offended that Mr. Largin would try to blame his sister for the crime. ..." (C. 122, citing Trial R. 152-44.)

(4)     "[T]he prosecutor improperly exhorted the jury to do its 'job' by delivering justice for the victims." (C. 123, citing Trial R. 866.)

(5)     "[T]he prosecutor's closing arguments improperly inflamed the passions of the jurors and encouraged them to reach a verdict based on sympathy and emotion. The prosecutor began by focusing his argument on the special status of the victims as parents and on the idea that Mr. Largin 'repaid' his parents for raising him and supporting him by killing them." (C. 123, citing Trial R. 2018-19.)[11]

The circuit court summarily dismissed this claim, finding that it

---

[11]Largin also alleged that counsel should have objected to the statement, "at the close of [the State's] rebuttal argument," that the jurors should "do justice for the victims' daughter, Sheri Largin Lake, as well as for the victims themselves." (C. 124, citing Trial R. 2075.) Largin abandoned this claim on appeal.

was insufficiently pleaded and that it lacked merit. (C. 615-16.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court addressed each of the issues on which Largin bases this ineffectiveness claim and held that those issues lacked merit. Largin, 233 So. 3d at 413-18. Largin has not addressed these holdings, and we will not repeat them here. But those holdings show that he is due no relief on this claim. See, e.g., Carruth, 165 So. 3d at 641.

Largin also argues on appeal that the alleged "improper comments and arguments ... cumulatively denied Largin his rights" and that counsel was ineffective for not objecting to those comments and arguments. In Woodward, we stated:

> "'"[T]his Court has noted: 'Other states and federal courts are not in agreement as to whether the "cumulative effect" analysis applies to Strickland claims'; this Court has also stated: 'We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel.' Brooks v. State, 929 So. 2d 491, 514 (Ala. Crim. App. 2005) ...; see also McNabb v. State, 991 So. 2d 313, 332 (Ala. Crim. App. 2007); and Hunt v. State, 940 So. 2d 1041, 1071 (Ala. Crim. App. 2005). More to the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analysis. A cumulative-effect analysis does not eliminate the pleading requirements established in Rule 32, Ala. R. Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative-effect analysis,

is performed only on properly pleaded claims that are not summarily dismissed for pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate [the petitioner's] obligation to plead each claim of ineffective assistance of counsel in compliance with the directives of Rule 32." ' "

Woodward, 276 So. 3d at 742 (quoting Bryant v. State, 181 So. 3d 1087, 1104 (Ala. Crim. App. 2011), quoting in turn Taylor v. State, 157 So. 3d 131, 140 (Ala. Crim. App. 2010)).

The circuit court found that "there was … no cumulative error based on these claims" because each of the underlying claims lacked merit. (C. 615.) Thus, even under a cumulative-error analysis, Largin would be due no relief. See, e.g., Wiggins v. State, 193 So. 3d 765, 813 (Ala. Crim. App. 2014) (holding that, because there was no error in any of the specific instances of alleged prosecutorial misconduct, there could be no cumulative error).

## J.

In claim I.B.7., Largin alleged that his trial counsel were "ineffective for failing to fully and properly object to the State's impeachment of Ernie Tubbs." (C. 125.) Largin alleged that "[t]he trial court allowed the State to cross-examine defense witness Ernie Tubbs on

the basis of mere charges, on the theory that these charges were relevant to establish a bias against the State as the prosecuting entity." (C. 125.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded and that it lacked merit. (C. 616.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court found no error or plain error in the State's cross-examination of Tubbs:

> "Before Largin called Tubbs to testify, Tubbs's attorney informed the court that he would object to any questions regarding the pending charges. The State informed the court that it was actively prosecuting Tubbs for rape and for failing to comply with requirements of the community-notification act, but that it would not ask Tubbs about the facts of those cases. The trial court agreed that the State could ask Tubbs whether he had pending charges, and Largin stated that he had no objections. Thereafter, in response to Largin's questions on direct examination, Tubbs testified that he was residing in the county jail and that he had been charged with failing to register as a sex offender, domestic violence, sodomy, and rape. During cross-examination, the State confirmed the charges pending against Tubbs.

> "'If error occurred it was invited by defense counsel. Invited error applies to death-penalty cases and operates to waive the error unless "it rises to the level of plain error." Ex parte Bankhead, 585 So. 2d 112, 126 (Ala. 1991).' Gobble v. State, 104 So. 3d 920, 945 (Ala. Crim. App. 2010). Largin did not raise this claim of error in the trial court and, in fact, he questioned Tubbs about the charges. As a result, we review for plain error only.

"The trial court has substantial discretion in determining the scope of cross-examination. E.g., <u>Albarran v. State</u>, 96 So. 3d 131, 165 (Ala. Crim. App. 2011). Rule 616, Ala. R. Evid., states, 'A party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party to the case or that the witness has an interest in the case.' In <u>Williams v. State</u>, 710 So. 2d 1276, 1298 (Ala. Crim. App. 1996), we stated that '[i]t is always permissible to cross-examine a witness to ascertain his or her interest, bias, prejudice, or partiality concerning matters about which he or she is testifying, and generally anything that tends to show the witness's bias, unfriendliness, enmity, or inclination to swear against a party, is admissible.' The pending charges against Tubbs for failing to register as a sex offender, domestic violence, sodomy, and rape and his incarceration in the county jail would reasonably give rise to the inference that Tubbs had a bias against the State. Therefore, the trial court committed no error or plain error when it permitted the State to cross-examine Tubbs and confirm the evidence Largin had elicited on direct examination."

<u>Largin</u>, 233 So. 3d at 429.

On appeal, Largin does not address this holding in <u>Largin</u>. This Court's holding in <u>Largin</u> shows that the claim underlying the allegation of ineffectiveness lacks merit. Thus, Largin is due no relief. <u>See, e.g.</u>, <u>Carruth</u>, 165 So. 3d at 641.

K.

In claim I.B.8., Largin alleged that his trial counsel were "ineffective at numerous points when counsel failed to object to the State

introducing testimony that Mr. Largin lacked remorse." (C. 126-27.) The petition cited testimony from Investigator Miller, George McShan, and Jill Wortham. (C. 127-28.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded and that it lacked merit. (C. 617.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court found no plain error in the admission of the testimony. Largin, 233 So. 3d at 426-27, 431.

On appeal, Largin challenges the circuit court's denial of this claim, but he does not identify any specific testimony or provide this Court with any citations to the record. This does not comply with Rule 28(a)(10), Ala. R. App. P. Largin also does not address this Court's holding in Largin that the claim underlying the allegation of ineffectiveness lacks merit. Thus, Largin is due no relief. See, e.g., Carruth, 165 So. 3d at 641.

L.

In claim I.B.9., Largin alleged that his trial counsel were "ineffective for failing to challenge the ways in which the State bolstered Sheri Largin Lake's testimony at trial." (C. 129.) Largin asserted that "the court allowed improper refreshing of recollection and leading

testimony" and that Sheri "was allowed numerous times to testify to hearsay and make statements without any foundation, improperly increasing the impact of her testimony." (C. 129.)  Largin alleged that the State improperly used the transcript of Sheri's 911 call to refresh her recollection, that the "prosecutor [led] Ms. Largin Lake to testify precisely in conformance with indictment," and that Sheri "testified that only she, her mother, and her father had keys to the house and that Mr. Largin had never been given [a] key to [the] house." (C. 129.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded and that it lacked merit. (C. 618.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court found that there was no plain error in the admission of the testimony.  Largin, 233 So. 3d at 432.

On direct appeal, this Court addressed the alleged error that underlies this ineffectiveness claim:

> "The State explained to the trial court its reason for using the transcript of the 911 call during Sheri's testimony and stated that it 'would offer to play the nine-one-one tape again, interrupting it from time to time with other questions for [Sheri], and provide copies to the jury so they can follow along and not lose their place in the conversation.' (R. 904.) The trial court permitted the transcripts to be used as a demonstrative aid during the testimony, which did not have

the effect of bolstering Sheri's testimony, and the trial court did not abuse its considerable discretion when it did so. E.g., <u>Blanton v. State</u>, 886 So. 2d 850, 868-69 (Ala. Crim. App. 2003). No plain error occurred.

"Largin's assertion that the trial court erred when it permitted the State to question Sheri in conformance with the indictment is meritless. The State had the burden of proving Largin's guilt beyond a reasonable doubt. In fulfilling its burden to prove its case, the State asked Sheri about items from her parents' home that she had been asked to identify in the months after the murders and which had been stolen during the commission of the crimes. That testimony did not bolster Sheri's credibility, and the trial court committed no plain error when it allowed the testimony.

"There is no merit to Largin's final claim that the trial court erred when it permitted Sheri to testify that, to her knowledge, her parents had never given Largin a key to their house. The testimony was based on her extensive personal knowledge of her parents' behavior and was properly admitted. The trial court did not abuse its discretion, and no plain error occurred."

<u>Largin</u>, 233 So. 3d at 432.

On appeal, Largin challenges the circuit court's summary dismissal of this claim, but he does not address this Court's holding in <u>Largin</u> that the claim underlying the allegation of ineffectiveness lacks merit. He merely asserts that trial counsel should have objected. Largin is due no relief. <u>See, e.g.</u>, <u>Carruth</u>, 165 So. 3d at 641.

M.

82

In claim I.B.10., Largin alleged that counsel was ineffective for not objecting to testimony from "the State's expert DNA witness, April Leon, … about testing of genetic material recovered from a metal mop handle found in the victims' kitchen." (C. 130.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded and that it lacked merit. (C. 619.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court found that there was no plain error in the admission of the testimony. Largin, 233 So. 3d at 432-33.

On direct appeal, this Court addressed the alleged error that underlies this ineffectiveness claim:

> "Largin's next claim of error is that the trial court erred when it allowed expert testimony about DNA evidence that was, he says, irrelevant, confusing, and unfairly prejudicial to him. Specifically, he argues that April Leon, a forensic biologist in the Alabama Department of Forensic Sciences, should not have been permitted to testify that the genetic material recovered from the handle of the mop found in the victims' kitchen was consistent with a mixture of Largin's and his mother's DNA. He states that the testimony was improper because, he says, with regard to another piece of evidence, Leon had testified that she could not differentiate between genetic material from Largin and from his father. We review for plain error because Largin did not raise this claim in the trial court.
>
> > "As we have stated repeatedly: 'The question of

admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). The premise underlying Largin's argument is that Leon should not have been able to testify that Largin's genetic material was part of the DNA mixture on the mop handle because, with regard to a sample of genetic material from another piece of evidence—the muzzle of a gun, Leon testified that she could not eliminate Largin as a source of the DNA mixture based on the biological relationship between him and his parents. Largin's premise is faulty. Leon testified that the reason she could not eliminate Largin as a contributor to the mixture of genetic material on the muzzle was that Peggy Largin was the major contributor to the material in the sample, and the amount of DNA from the minor contributor was insufficient to eliminate Largin as the contributor. Therefore, Leon was testifying about two distinct samples of genetic material, and the inconclusive results regarding the muzzle did not preclude testimony about the clear results she found during her examination of the genetic material on the mop handle.

"The testimony about the genetic material on the mop handle was relevant, see Rule 401, Ala. R. Evid., because it corroborated Largin's statement to the police and supported the State's theory of the case by establishing that Largin had tried to clean up the blood in the kitchen.

"Thus, the evidence was relevant and not unfairly prejudicial, Leon did not overstate her conclusions, and there was no plain error in the admission of the testimony."

Largin, 233 So. 3d at 432-33.

On appeal, Largin challenges the circuit court's summary dismissal of this claim, but he does not address this Court's holding in Largin that

the claim underlying the allegation of ineffectiveness lacks merit. He merely asserts that trial counsel should have objected and reiterates the arguments that this Court rejected on direct appeal. Largin is due no relief. See, e.g., Carruth, 165 So. 3d at 641.

N.

In claim I.B.11., Largin alleged that his trial counsel were ineffective for not objecting "to unnecessary and prejudicial autopsy photographs admitted at trial." (C. 133.) The State offered 23 autopsy photographs; Largin's counsel objected only to a photograph of Peggy's body "in which the top of the skull had been removed." (C. 133.) Largin alleged that if counsel had objected to all the photographs, "there is a reasonable probability that [the circuit court] would have sustained the objections and limited which gruesome pictures the jury saw," and "there is a reasonable probability that Mr. Largin would not have been found guilty of murder or sentenced to death." (C. 134.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded and that it lacked merit. (C. 620.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court found that there was no error, plain or otherwise, in

the admission of the photographs. <u>Largin</u>, 233 So. 3d at 433-34. As for the one photograph that trial counsel objected to, this Court held that "[e]ven though the photograph was gruesome, it demonstrated the character and location of wounds, and illustrated the medical examiner's testimony." 233 So. 3d at 434. This Court held:

> "We reach the same conclusion as to the remaining photographs. They depicted the character and extent of the victims' internal and external wounds, and they were used to aid the medical examiner's testimony. The trial court did not commit any error, much less plain error, when it admitted the photographs into evidence."

233 So. 3d at 434.

On appeal, Largin challenges the circuit court's summary dismissal of this claim, but he does not address this Court's holding in <u>Largin</u> that the claim underlying the allegation of ineffectiveness lacks merit. He merely asserts that trial counsel should have objected to all the photographs, and he reiterates the arguments that this Court rejected on direct appeal. Largin is due no relief. <u>See, e.g.</u>, <u>Carruth</u>, 165 So. 3d at 641. <u>Cf.</u> <u>McNabb</u>, 991 So. 2d at 326.

## O.

In claim I.C.1., Largin alleged that counsel were ineffective for not objecting "to prosecutorial misconduct during the penalty phase of trial."

(C. 134.) Largin alleged six instances of prosecutorial misconduct, and argued that those "improper comments and arguments, individually and cumulatively," violated his rights. (C. 135-40.)

The circuit court summarily dismissed this claim, finding that it was insufficiently pleaded and that it lacked merit. (C. 621.) The circuit court cited this Court's rejection of the underlying claim on direct appeal in which this Court found that there was no error, plain or otherwise, in the same six instances of alleged misconduct. Largin, 233 So. 3d at 416-22. The circuit court also cited this Court's rejection on direct appeal of Largin's argument that "the cumulative effect of the prosecutor's closing arguments" violated his rights. (C. 621, citing Largin, 233 So. 3d at 422-23.)

On appeal, Largin challenges the circuit court's summary dismissal of this claim, but he does not address this Court's holding in Largin that the claim underlying the allegation of ineffectiveness lacks merit. Largin is due no relief. See, e.g., Carruth, 165 So. 3d at 641. Cf. McNabb, 991 So. 2d at 326.

## CONCLUSION

The judgment of the circuit court is affirmed.

AFFIRMED.

McCool and Cole, JJ., concur. Kellum, J., concurs in the result. Windom, P.J., recuses herself.